THE STATE OF OHIO, APPELLEE, *v*. PALMER, APPELLANT.

[Cite as *State v. Palmer* (1997), 80 Ohio St.3d 543.]

*Criminal law — Aggravated murder — Death penalty upheld, when — Appellate procedure — Requirement of a complete, full, and unabridged transcript in capital trials does not mean that trial record must be perfect for purposes of appellate review.*

The requirement of a complete, full, and unabridged transcript in capital trials does not mean that the trial record must be perfect for purposes of appellate review.

(No. 96-2301 — Submitted August 26, 1997 — Decided December 31, 1997.)

APPEAL from the Court of Appeals for Belmont County, No. 89-B-28.

On May 7, 1989, Edward Hill, appellant Donald L. Palmer, Jr., and appellant's sister, Mildred "Angel" Patterson, drove from Columbus to Belmont County, Ohio, in a brown Dodge Charger owned by Hill. On May 8, appellant and Hill spent much of the day driving around Belmont County and in nearby Yorkville and Tiltonsville, Ohio. On at least two occasions, the men drove past the residence of George Goolie at the intersection of County Road 2 and Glen Robbins Road in Belmont County. Goolie had previously dated Cammy Palmer, who is appellant's ex-wife and Hill's sister. Appellant and Hill were allegedly (according to the state) preparing to either rob Goolie or to burglarize his residence. Goolie's residence had previously been burglarized in February 1989, and Goolie had asked his friend, Charles Sponhaltz, to check on the residence whenever Sponhaltz drove by.

On May 8, at approximately 5:00 p.m., while Hill and appellant were driving on County Road 2 in the vicinity of Goolie's residence, Hill's vehicle apparently struck the rear of a white pickup truck driven by Sponhaltz. There was

little or no damage to either vehicle. Following the accident, appellant got out of Hill's vehicle and proceeded to shoot Sponhaltz twice in the head. At some point, Steven Vargo, a passing motorist, stopped at the scene and parked his vehicle behind Hill's Dodge Charger. When Vargo got out of the vehicle, appellant shot him twice in the head. Hill and appellant loaded Sponhaltz's body into the bed of Sponhaltz's pickup truck, abandoned the truck in a field near the scene of the killings, and fled the area in the brown Dodge Charger. Vargo's body and vehicle were left on the roadway at the scene of the murders.

On May 8, at approximately 5:15 p.m., Matthew Rutter was driving on County Road 2 toward Mt. Pleasant, Ohio, when he observed a white pickup truck, followed very closely by a brown Dodge Charger, speeding down the road in the opposite direction. After proceeding further on County Road 2, Rutter discovered Vargo's body lying on the roadway directly across from Vargo's vehicle. Rutter shook Vargo's arm to see if he was alive, but Vargo did not respond. Rutter then left the scene, notified authorities in nearby Mt. Pleasant, and returned to the scene with an emergency squad. James Tanner, an emergency medical technician, checked Vargo's vital signs and determined that he was dead. Tanner then secured the area until police arrived.

Approximately fifty feet from Vargo's body, police found two puddles of blood, a cigarette lighter, and a pack of cigarettes of the type Sponhaltz normally smoked. Police found no wallet, money, or identification papers on Vargo's body. Evidence at trial indicated that Vargo had been carrying approximately $20 on the day of the murders.

Police discovered Sponhaltz's body in the bed of his pickup truck, approximately seven-tenths of a mile from the scene of the murders. Investigators found no wallet, money, or identification papers on Sponhaltz's body.

2

Additionally, the right front pocket of Sponhaltz's jeans had been pulled inside out, indicating that Sponhaltz had been the victim of a robbery.

Dr. Norman Franklin performed the autopsy of the victims. Franklin found that each victim had died as a result of gunshot wounds to the head. Franklin recovered two small-caliber lead projectiles from the head of each victim. There were two entrance wounds on the left side of Sponhaltz's head, and an entrance wound on the left and on the right side of Vargo's head. An area of stippling on Vargo's skin indicated that one of the shots had been fired into Vargo's head from a distance of less than two feet.

Prior to the murders, in the early morning hours of May 8, Sergeant Jon Hawthorne of the Belmont County Sheriff's Department had stopped a brown Dodge Charger in Belmont County and had briefly detained the occupants. At the time of the traffic stop, Hill was driving the vehicle and another man, later identified as appellant, was riding as a passenger. Hawthorne apparently ran a computer check on the license plate number of the vehicle (Ohio license plate No. 546 STC), and had determined that the vehicle was registered to Hill. After checking the identity of the driver, Hawthorne allowed the two men to proceed. Following the murders, Hawthorne made a connection between the vehicle he had stopped in the early morning hours of May 8 and the description of the vehicle Rutter had later observed near the scene of the homicides.

Additionally, on May 8, prior to the murders, two men in a brown Dodge Charger had stopped at Midei Service Center in Tiltonsville, Ohio, at approximately 3:40 p.m., and again at approximately 4:40 p.m. Employees at Midei thought that the occupants of the vehicle were acting "strange," and at least one employee thought that the men were "casing the place." At one point, Richard Kolb, the manager at Midei, said to Thomas R. Critser, a coworker, "Let's write

3

this license number down." Critser responded, "Why? I have already got it." Following the murders, the license plate number Critser had written on a piece of paper, Ohio license plate No. 546 STC, was turned over to police.

Fred Thompson was the homicide investigator for the Belmont County Sheriff's Department. Based on information supplied by Sergeant Hawthorne and the description of the vehicle Rutter had observed near the scene of the murders, Thompson began to focus his investigation on the brown Dodge Charger, Ohio license plate No. 546 STC, owned by Hill. Additionally, in the course of his investigation, Thompson obtained the license plate number of the vehicle Kolb and Critser had observed at Midei Service Center, *i.e.*, Hill's brown Dodge Charger, Ohio license plate No. 546 STC.

On Sunday, May 14, appellant called the Belmont County Sheriff's Department and left a message for Thompson. On Monday, May 15, Thompson returned the call and spoke with appellant. During the conversation, appellant asked Thompson whether he (appellant) was a suspect in the homicides. Thompson responded, "I don't know. Are you?" At that point, appellant informed Thompson that appellant and Hill had been in Belmont County on May 7 and 8. Appellant claimed that, on May 8, appellant and Hill had taken Angel Patterson to cash a Social Security disability check and to run errands. Afterwards, appellant and Hill drove around the area in Hill's vehicle. Appellant told Thompson that appellant and Hill had driven past George Goolie's residence. Goolie lived approximately a quarter of a mile from the scene of the murders. Additionally, appellant told Thompson that while appellant and Hill were in Belmont County, a .22 caliber pistol had "turned up missing" from appellant's apartment. Prior to the conversation, Thompson had already suspected that the murder weapon was a small-caliber weapon, possibly a .22 or .25 caliber handgun.

4

On Tuesday, May 16, Thompson drove to Columbus to locate appellant and Hill for questioning. After attempting to locate Hill, Thompson drove to appellant's apartment complex and saw the two men pulling into the parking lot in Hill's Dodge Charger. Thompson took appellant and Hill to the Columbus police station for questioning. There, appellant voluntarily agreed to speak with police after being advised of his *Miranda*[1] rights. During questioning, appellant lied to police and denied any involvement in the murders. However, when the police indicated that they had certain evidence linking appellant and Hill to the scene of the murders, appellant confessed to the killings. During his confession, appellant provided police with the following detailed account of the homicides.

On May 8, in the late afternoon, appellant and Hill drove past Goolie's residence at the corner of County Road 2 and Glen Robbins Road. Hill was driving the Dodge Charger, and appellant was a passenger. Hill and appellant had been looking for Goolie most of the day, and had previously driven past Goolie's residence and his place of employment. As Hill drove past Goolie's residence one final time, appellant was holding a .22 caliber pistol he had been firing out the window of Hill's vehicle. After appellant and Hill had passed the residence, a white pickup truck traveling in front of Hill's vehicle either stopped or suddenly slowed down, and Hill's vehicle hit the rear of the truck. Appellant told police that he was "almost positive" the driver of the truck "did it [caused the accident] on purpose." After the accident, Hill and Sponhaltz got out of their vehicles, and appellant exited the passenger's side of Hill's vehicle with the .22 caliber pistol. According to appellant, the driver of the pickup (Sponhaltz) cursed at Hill, and said, "what in the hell are you trying to prove?" Sponhaltz then "grabbed" Hill. At that point, appellant swung at and struck Sponhaltz with the pistol, and discharged the weapon near the left side of Sponhaltz's head. Hill began

5

screaming, and appellant mistakenly thought that he (appellant) had shot Hill. However, after the victim fell to the ground, Hill said, "Kill him. Kill him." Appellant then fired two shots into Sponhaltz's head, knowing that the shots would kill him. Appellant told police that he shot Sponhaltz a total of three times, once when he swung at and struck Sponhaltz with the gun, and twice while Sponhaltz was lying on the ground.

After shooting Sponhaltz, appellant went back to Hill's vehicle. At that point, Hill asked appellant to help load the victim into the bed of the victim's pickup truck. While appellant and Hill were attempting to load Sponhaltz into the bed of the truck, or while Sponhaltz's body was still lying on the pavement, a passing motorist (Vargo) arrived on the scene. Vargo pulled up to the scene, backed up, and parked his vehicle behind Hill's car. Vargo then got out of his vehicle and said, "What the hell did you guys do?" Appellant walked toward the rear of Hill's car, Vargo "grabbed a hold" of appellant's shirt, and appellant shot Vargo in the head. Hill and appellant then loaded Sponhaltz into the bed of Sponhaltz's truck. Appellant admitted to police that he took money from Sponhaltz while loading him into the bed of the truck. Appellant told police that he thought the money (a $5 bill and some change) had simply fallen out of Sponhaltz's pocket. After loading Sponhaltz's body into the bed of the truck, Hill drove away from the scene in Sponhaltz's truck, and appellant followed in Hill's Dodge Charger.

After abandoning the pickup truck, appellant and Hill drove back to Columbus. Appellant told police that he disposed of the murder weapon a few days later by throwing it into Hoover Reservoir in Westerville, Ohio, just north of Columbus. During his confession, appellant indicated that the murder weapon was an old, chrome-plated .22 caliber pistol he had borrowed from Cammy Palmer

6

prior to the murders. Appellant also told police that he had purchased a bottle of Southern Comfort whiskey on May 8, and claimed that he had consumed the alcohol prior to the killings.

During appellant's confession, Detective Jerry McMenemy of the Columbus Police Department asked why appellant and Hill had been in the vicinity of Goolie's residence. McMenemy said, "You might as well tell us, what were you going there to George's house for, what were you going to do to George's house? Is it possible you were going to burglarize that house or what?" Appellant responded, "Yup." McMenemy also asked appellant: "Is that why you were staking it out, seeing where he [Goolie] was at and stuff like this?" In response to that question, appellant stated: "No. We went out there. Yeah, sort of. We didn't know where he was at."

On May 16, following his confession, appellant spent the night at the Franklin County Jail. There, appellant spoke to Deputy Sheriff William S. Hatzer, a guard at the jail. Appellant told Hatzer that a car appellant and Hill were driving had rear-ended a second vehicle, and that the driver of that vehicle (Sponhaltz) had started a fight with Hill. Appellant told Hatzer that he attempted to intervene in the fight by striking the driver of the other vehicle, and that a .22 caliber gun in appellant's hand "accidently [*sic*] went off." Appellant told Hatzer that he "shot the man two more times," and that a third car arrived on the scene. According to Hatzer, appellant admitted shooting the driver of the third vehicle (Vargo) because appellant thought that the driver of that vehicle may have witnessed the first shooting.

On May 17, Thompson drove appellant back to Belmont County. On the way, appellant volunteered to show police where the victims' wallets and personal effects were buried. Appellant directed police to a remote area near the American

7

Legion in St. Clairsville. Appellant indicated that Hill had buried the items in a wooded area on the hillside. Later, Hill directed police to the precise location of the evidence. In a hole at the base of a felled tree, police found four spent .22 caliber bullet casings, identification cards, and papers and personal effects belonging to the victims. In the same general area, police found the victims' wallets and two additional spent .22 caliber bullet casings. Police did not find any money in the area where the wallets and other evidence had been located.

Appellant was placed on "suicide watch" during his incarceration in Belmont County. Special (reserve) deputies for the Belmont County Sheriff's Department were assigned to guard appellant and to periodically check on him. Between May 21 and May 28, appellant initiated a number of conversations with the deputies assigned to guard him.

On May 26, Special Deputy Peter Busack was reading a book near appellant's jail cell. At one point, appellant said that it was stupid for him to have "popped" the two victims. According to Busack, appellant showed no remorse while talking about the killings.

Special Deputy David Taylor was working suicide watch on May 21. On that date, an inmate asked Taylor whether Taylor had seen the "trigger man," apparently referring to appellant. Appellant apparently overheard the conversation and proceeded to tell Taylor about the killings. According to Taylor, appellant admitted shooting the first victim, and also admitted that he "shot him [Sponhaltz] again to make sure he was dead."

On May 28, Taylor was once again guarding appellant on suicide watch. Taylor was seated next to appellant's cell and was reading and studying textbooks. Appellant told Taylor that he had been driving a vehicle and was involved in an accident. Appellant said that the driver of the other vehicle (Sponhaltz) got out of

8

his car and that an argument and a struggle took place. Appellant claimed that he went to strike the man with a gun, but that the weapon accidentally discharged. Appellant told Taylor that everything had happened so fast that "it didn't * * * even feel like I had got done shooting the first guy and the second guy was already there." According to Taylor, appellant admitted shooting the second victim because appellant believed that the second victim "had seen what happened."

On May 28, Special Deputy Joseph Sesko was guarding appellant on suicide watch. During Sesko's shift, appellant began talking about the murders. According to Sesko, appellant claimed that he had originally come to Martins Ferry to see a man named George, who was dating appellant's ex-wife. Appellant told Sesko that, on the day of the murders, appellant had purchased a bottle of whiskey because he was "wired up on cocaine." According to Sesko, appellant said that he and Hill had been driving around Martins Ferry on May 8 and had stopped in the Glen Robbins area to shoot a .22 caliber handgun. Later, Hill, the driver, accidentally struck the rear of a truck. Appellant said that the driver of the truck started yelling at Hill, so appellant went over and struck the man, and the gun appellant was carrying "went off." According to Sesko, appellant also said that when the man "went down," appellant "shot him again." Sesko was no longer paying any attention to appellant when appellant began to explain Vargo's murder.

The weapon appellant used in the murders was never recovered by police. However, during the course of the homicide investigation, police learned that the murder weapon might have been part of a matched set of weapons owned by a Mr. James Fox in Martins Ferry. Specifically, on May 15, when Thompson spoke with appellant on the telephone, appellant gave Thompson a description of the pistol that had allegedly "turned up missing" from appellant's apartment. Appellant told Thompson that the pistol was a chrome-plated .22 caliber weapon with the word

9

"Defender" inscribed on top. Following the May 15 telephone conversation, Thompson interviewed Cammy Palmer, who was familiar with the pistol. Cammy told Thompson that the pistol was part of a matched set belonging to Mr. Fox in Martins Ferry. Police located Fox and asked him if he was missing a firearm. Fox informed police that he was missing a .22 caliber pistol from a matched set, and that the pistol had the word "Defender" inscribed on it. Fox gave police two pistols, a chrome-plated .22 caliber pistol with the word "Eureka" inscribed on the top of the weapon, and a .32 caliber pistol with the word "Defender" inscribed on the top. At trial, the prosecution produced these two weapons as a single demonstrative exhibit (state's exhibit 29), claiming that one or both of the weapons matched (*i.e.*, were similar to) the weapon used in the killings.

Thomas McCort, the Sheriff of Belmont County, testified concerning the operation of the two firearms acquired from Fox. Both weapons were single-action spur-trigger revolvers, also known as "river boat gambler's pistol[s]." McCort demonstrated that, with respect to both revolvers, the hammer mechanism must be pulled back, and the trigger then pulled, in order to fire the weapons. McCort indicated that a spur trigger is a safety device, and that even if the hammer on a single-action spur-trigger revolver is pulled back and cocked, some additional effort is required to look or feel for the trigger in order to fire the weapon. McCort concluded that the weapons in state's exhibit 29 could not accidentally be fired.

Appellant was indicted by the Belmont County Grand Jury for the aggravated murders of Sponhaltz and Vargo. For each of these two murders, two counts were returned: one charging that the offense was committed with prior calculation and design (R.C. 2903.01[A]), and one charging felony murder (R.C. 2903.01[B]). Each of the four counts of aggravated murder carried R.C. 2929.04(A)(5) and 2929.04(A)(7) death penalty specifications. Additionally, the

10

aggravated murder counts pertaining to Vargo (Count Four alleging prior calculation and design, and Count Six alleging felony murder) both contained an R.C. 2929.04(A)(3) death penalty specification. Appellant was also indicted on two counts of aggravated robbery. Each count in the indictment carried a firearm specification.

In October 1989, the matter proceeded to trial before a jury. At trial, appellant testified in his own defense. Appellant claimed that on May 7, Hill, appellant, and Patterson drove from Columbus to Belmont County to pick up a Social Security disability check for Patterson. Appellant denied that he had gone to Martins Ferry to rob Goolie or to burglarize Goolie's residence. Appellant testified that after dropping Patterson off at her apartment in Martins Ferry, appellant and Hill drove around in Hill's vehicle, picked up Patterson's check, and were pulled over later that night by Sergeant Hawthorne of the Belmont County Sheriff's Department. On May 8, appellant took Patterson to the bank, and then dropped her off at her apartment. Appellant claimed that, on May 8, at approximately 2:00 p.m., appellant and Hill drove into Martins Ferry and purchased a bottle of Southern Comfort whiskey. Appellant testified that, at some point, appellant and Hill drove to a shooting range in the Glen Robbins area to shoot a .22 caliber pistol appellant had borrowed from Cammy Palmer in April 1989. On the way, they drove past Goolie's residence. According to appellant, Goolie did not appear to be at home. After firing the gun, appellant and Hill decided to drive to Yorkville to see if Goolie was there. Later that afternoon, appellant and Hill stopped at Midei Service Center on two separate occasions. Appellant admitted stopping at Midei at approximately 4:40 p.m. to purchase gasoline, but denied that he was "casing the joint." According to appellant, by

11

4:40 p.m., he had already consumed most of the alcohol he had purchased earlier that day.

After purchasing gasoline at Midei Service Center, appellant and Hill continued to drive around in Hill's Dodge Charger. Hill, who was driving the vehicle, drove in the vicinity of Goolie's residence. Appellant testified that, at one point, he was firing the .22 caliber pistol out the window of Hill's vehicle. According to appellant, Hill drove past Goolie's residence one last time on the way to Martins Ferry, and appellant noticed a white pickup truck traveling in front of Hill's vehicle. The truck proceeded up a hill on County Road 2 and around a curve. According to appellant, when Hill drove around the bend, the truck either slowed down or stopped, and Hill rear-ended the vehicle. Following the accident, all three got out of their vehicles. Appellant testified that Sponhaltz began "ranting and raving" and "throwing a fit." According to appellant, Sponhaltz went to grab Hill, so appellant "grabbed his [Sponhaltz's] arm and swung to hit him, and the weapon went off while — either after I hit him, while I hit him or during, just during the time, the same time I swung at him." Appellant claimed that he did not know that the .22 caliber pistol was in his hand until after the weapon had discharged. According to appellant, Sponhaltz then uttered an expletive and fell to the ground, and Hill said, "Kill him. Kill him." Appellant recalled hearing two additional shots, but claimed to have no recollection of pulling the trigger.

Appellant testified that after he had shot Sponhaltz, he backed away from the scene, turned, and ran directly into Vargo. Appellant claimed that he never saw Vargo pull up to the scene. According to appellant, Vargo put his hands up either to stop appellant from running into him or to grab him, and appellant, without thinking, "pulled the trigger." Appellant thought he recalled shooting Vargo three times, but acknowledged that he had only been shot twice. After

shooting Vargo, appellant and Hill loaded Sponhaltz's body into the bed of Sponhaltz's pickup truck and abandoned the truck. After returning to Columbus, appellant allegedly disposed of the murder weapon by throwing it into the Hoover Reservoir.

Appellant testified that he never intended to kill Sponhaltz and Vargo. Appellant claimed that he shot Sponhaltz the first time by accident and while attempting to protect Hill. According to appellant, he shot Sponhaltz again in the "mass confusion" that occurred following the first shot. Appellant also claimed that he had shot Vargo as a result of panic and confusion. Appellant testified that both killings occurred within a period of ten to fifteen seconds, and that he never had a chance to reflect on what he was doing. Appellant denied telling sheriff's deputies that he shot Sponhaltz twice to make sure that Sponhaltz was dead, and that he shot Vargo because Vargo was a witness to the first shooting. Appellant testified that he never had any intention of robbing the victims before their deaths, and that he did not personally take the victims' wallets or money. With respect to the money appellant had previously admitted taking from Sponhaltz, appellant stated, "When I think about it now, I see money, a five dollar bill, falling out of one of the wallets inside of Mr. Hill's vehicle."

On cross-examination, appellant testified that when he had borrowed the murder weapon from Cammy Palmer in April 1989, Cammy told appellant that "Mr. Fox owned a match to the gun." Additionally, appellant admitted that the .22 caliber pistol in state's exhibit 29 was similar to the pistol he had used to kill Sponhaltz and Vargo. Appellant testified that the hammer mechanism on the murder weapon (like the .22 caliber pistol in the state's exhibit) had to be pulled back, and the trigger then pulled, in order for the weapon to fire. Appellant also conceded that the murder weapon could not have accidentally discharged without

13

the hammer first being pulled back and cocked. Specifically, the prosecutor asked appellant whether the hammer on the murder weapon had been pulled back when appellant hit Sponhaltz with the pistol. In response, appellant stated, "It certainly would have to be if the gun went off."

Nancy Piper, an employee at the Martins Ferry Liquor Store, was also called to testify for the defense. Piper testified that, on May 8, she sold two bottles of Southern Comfort whiskey between 1:45 and 2:30 p.m. Hill was called to testify, but refused to answer questions on the advice of his attorney.[2] The defense also attempted to call Cammy Palmer, but Cammy apparently failed to appear.

The jury found appellant guilty of all charges and specifications alleged in the indictment, with one exception.[3] Following a mitigation hearing, the jury recommended that appellant be sentenced to death for each of the four counts of aggravated murder. The trial court accepted the jury's recommendations and imposed the sentence of death. For the aggravated robberies of Sponhaltz and Vargo (and for the associated firearm specifications), appellant was sentenced in accordance with law. On appeal, the court of appeals, in August 1996, affirmed the judgment of the trial court and upheld appellant's death sentence.

The cause is now before this court upon an appeal as of right.

_____

*Frank Pierce*, Belmont County Prosecuting Attorney, and *Robert W. Quirk*, Assistant Prosecuting Attorney; *Joyce S. Anderson*, Franklin County Assistant Prosecuting Attorney, for appellee.

*Ken Murray* and *Nathan A. Ray*, for appellant.

_____

**DOUGLAS, J.** Appellant presents twenty-five propositions of law for our consideration. (See Appendix, *infra*.) We have carefully considered each of

14

appellant's propositions of law and have reviewed the death sentence for appropriateness and proportionality. Upon review, and for the reasons that follow, we affirm the judgment of the court of appeals and uphold the sentence of death.

I

We have held, time and again, that this court is not required to address and discuss, in opinion form, each and every proposition of law raised by the parties in a death penalty appeal. We adhere to that position today. Many of the issues raised by appellant have been addressed and rejected by this court under analogous circumstances in a number of our prior cases. Our positions on these issues have not changed. Additionally, many of appellant's arguments have been waived. Upon a careful and extensive review of the record, the governing law, and the arguments advanced by the parties, we fail to detect any errors requiring reversal of appellant's convictions and death sentence. We remain absolutely convinced that appellant received a fair trial, competent legal representation, and a fair and reliable sentencing determination. We have found nothing in the record or in the arguments advanced by appellant that would, in any way, undermine our confidence in the integrity and reliability of the trial court's findings. We address and discuss, in detail, only those issues that merit some further discussion.

II

Crim.R. 22 provides that "[i]n serious offense cases all proceedings shall be recorded." App.R. 9(A) requires that "[i]n all capital cases the trial proceedings shall include a written transcript of the record made during the trial by stenographic means." Additionally, this court has specifically held that a capital defendant is entitled to a "complete, full, and unabridged transcript of all proceedings against him so that he may prosecute an effective appeal." *State ex rel. Spirko v. Court of Appeals* (1986), 27 Ohio St.3d 13, 18, 27 OBR 432, 436,

501 N.E.2d 625, 629. However, we have never held that "complete, full, and unabridged" is synonymous with "perfect." See, generally, *State v. DePew* (1988), 38 Ohio St.3d 275, 278-279, 528 N.E.2d 542, 548, and *State v. Spirko* (1991), 59 Ohio St.3d 1, 15-16, 570 N.E.2d 229, 247. Accordingly, we now hold that the requirement of a complete, full, and unabridged transcript in capital trials does not mean that the trial record must be perfect for purposes of appellate review.

In his first proposition of law, appellant contends that the record in this case is inadequate for appellate review because certain bench and chambers conferences were not recorded and made part of the trial transcript, and because no transcript was made of a jury visit to the crime scene. Therefore, appellant maintains that his convictions and death sentence must be vacated and that a new trial must be ordered. We disagree.

During the years this case was on appeal to the court of appeals, appellant made an effort to complete and correct the record pursuant to App.R. 9(C) and (E). The record transmitted to the court of appeals included transcripts from certain hearings and all available transcripts covering proceedings from arraignment through sentencing. In an effort to recreate, among other things, the several bench and chambers conferences that were not recorded and transcribed, appellant requested and obtained leave to complete and supplement the record on appeal. Thereafter, appellant filed, in the court of appeals, an agreed statement of the evidence or proceedings ("agreed statement") pertaining to the unrecorded bench and chambers conferences, other off-the-record discussions, and the unrecorded jury view. The agreed statement was signed by appellant's trial attorneys, appellant's appellate counsel, and the Belmont County Prosecuting Attorney. Additionally, a copy of the agreed statement was also filed with the trial court, was eventually settled and approved by entry of the trial court, and was transmitted to

16

the court of appeals. The agreed statement summarizes what occurred during some of the unrecorded conferences, and identifies a few other unrecorded conferences where the recollections of the parties were insufficient to provide an accurate and detailed summary.

In a number of cases involving death penalty appeals, this court has clearly held that reversal of convictions and sentences on grounds of some unrecorded bench and chambers conferences, off-the-record discussions, or other unrecorded proceedings will not occur in situations where the defendant has failed to demonstrate that (1) a request was made at trial that the conferences be recorded or that objections were made to the failures to record, (2) an effort was made on appeal to comply with App.R. 9 and to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted from the failure to record the proceedings at issue. See, generally, *State v. Grant* (1993), 67 Ohio St.3d 465, 481-482, 620 N.E.2d 50, 68; *State v. Davis* (1991), 62 Ohio St.3d 326, 347, 581 N.E.2d 1362, 1380; *Spirko*, 59 Ohio St.3d at 15-16, 570 N.E.2d at 247; *State v. Jells* (1990), 53 Ohio St.3d 22, 32, 559 N.E.2d 464, 473-474; *State v. Tyler* (1990), 50 Ohio St.3d 24, 41-42, 553 N.E.2d 576, 596; and *State v. Brewer* (1990), 48 Ohio St.3d 50, 60-61, 549 N.E.2d 491, 501-502. In the case at bar, appellant has attempted to comply with App.R. 9 to correct the record and to reconstruct the unrecorded conferences. However, appellant has failed to demonstrate that his trial counsel ever requested recordation of the matters at issue and, most important, appellant has failed to affirmatively demonstrate any material prejudice resulting from the unrecorded matters to which he now takes exception.

Nevertheless, appellant suggests that because not every unrecorded bench and chambers conference could be accurately reproduced in total detail, and since no transcript exists of the jury's visit to the crime scene, he is now entitled to a

presumption of prejudice arising from the failures to record. However, our cases clearly hold that prejudice will not be presumed from the mere existence of, among other things, unrecorded bench and chambers conferences in capital cases. See, *e.g.*, *Grant,* 67 Ohio St.3d at 481, 620 N.E.2d at 68 (requiring a showing of prejudice from an incomplete record involving unrecorded bench and chambers conferences even where attempts had been made to complete and reconstruct the record on appeal); *Spirko,* 59 Ohio St.3d at 15-16, 570 N.E.2d at 247 (requiring proof of demonstrable prejudice from an incomplete record involving unrecorded bench conferences); *Jells,* 53 Ohio St.3d at 32, 559 N.E.2d at 473-474 (same principle); *Brewer,* 48 Ohio St.3d at 60-61, 549 N.E.2d at 501-502 (rejecting presumption of prejudice from unrecorded sidebar conferences and recognizing that, in the absence of an attempt to reconstruct the substance of the remarks *and demonstrate prejudice*, the error may be considered waived); *Tyler,* 50 Ohio St.3d at 41-42, 553 N.E.2d at 596 (same principle); *Davis*, 62 Ohio St.3d at 347, 581 N.E.2d at 1380 (same). See, also, *DePew*, 38 Ohio St.3d at 278-279, 528 N.E.2d at 548-549 (where transcripts contain occasional lapses due to inaudibility, capital defendant must demonstrate prejudice resulting from the incompleteness of the record). Clearly, appellant must demonstrate the existence of some material prejudice resulting from the failures to record.

Appellant attempts to demonstrate prejudice by specifically pointing to the agreed statement and announcing that prejudice is "clear" and "obvious." Appellant also argues that "Mr. Palmer was severely prejudiced because his counsel was unable to fulfill his duties to the court or raise every colorable claim for relief on appeal due to the lack of a complete record." However, such general averments do not act as a substitute for an actual showing of prejudice. See, generally, *DePew* at 279, 528 N.E.2d at 548 (allegations that information missing

18

from the record "could be vital" do not amount to the required demonstration of prejudice). Moreover, contrary to appellant's assertions, the information contained in the agreed statement does not clearly or obviously indicate any material prejudice.

A review of the recorded transcripts in this case reveals that most bench and chambers conferences were recorded, and that all crucial aspects of the case, such as objections to evidence and instructions, were discussed in recorded conferences. Additionally, the transcripts reveal that whenever unrecorded bench and chambers conferences did occur, defense counsel made no request on the record that they be recorded, thereby waiving the error involved. *Grant,* 67 Ohio St.3d at 481, 620 N.E.2d at 68. With respect to the agreed statement, the summaries suggest an absence of prejudice, not its existence. For instance, the inability of the parties, the court reporters, and the trial judge to recall certain conversations and discussions, and events that prompted certain conversations and discussions, or even the nature of some conversations and discussions, strongly indicates the relative unimportance of the matters involved.

The agreed statement indicates that some of the unrecorded bench and chambers conferences involved logistics issues, scheduling matters, or other issues that were later resolved. Additionally, one prospective juror was dismissed for cause due to a death in his family, and the dismissal occurred off the record. Another unrecorded conference involved a question whether one of appellant's trial attorneys knew a prospective juror, but that issue was apparently resolved. One unrecorded conference apparently involved a suggestion by the trial judge that defense and prosecuting attorneys could inquire further into some potential problems or concerns that had been expressed by certain prospective jurors. However, none of the parties or court reporters could remember the specific

problems or concerns that had prompted the trial judge to make that suggestion. Another unrecorded conference involved a suspected *Brady* violation by the prosecution for failure to disclose allegedly favorable information to the defense, but defense counsel never fully pursued that issue on the record, and the agreed statement and transcripts clearly indicate that no such violation occurred. See *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

The agreed statement also reveals that there was one unrecorded chambers conference in the guilt phase concerning the .22 caliber pistol included in state's exhibit 29. During the conference, defense counsel argued against the admission of the demonstrative exhibit and suggested that a limiting instruction would be insufficient if the exhibit was admitted into evidence. The various issues and arguments concerning state's exhibit 29 are also clear from the recorded transcripts in this case, and we find that the trial court did not err in admitting the exhibit into evidence with a proper limiting instruction. See discussion in Part VI, *infra*.

Additionally, one of appellant's trial attorneys recalled that there was an unrecorded conference during the guilt phase where the defense allegedly raised or discussed specific objections and requests regarding the trial court's proposed jury instructions. The attorney could not recall what specific objections and requests were made, or even when the unrecorded conference occurred. Apparently, no other person involved in the trial had any similar recollection of these events. However, if the alleged off-the-record objections and requests had been considered crucial by the defense, and if those objections and requests were overruled and denied in an unrecorded conference, we have no doubt that those same objections and requests would have been raised *on the record* before the jury retired to consider its verdicts in the guilt phase. The only two objections defense

20

counsel specifically raised *on the record* immediately prior to (and following) the trial court's charge to the jury during the guilt phase involved the absence of an instruction on the issue of self-defense and on involuntary manslaughter as a lesser included offense of aggravated murder. Appellant was entitled to neither of these two instructions. See discussion in Parts IV and V, *infra*. Moreover, we have reviewed all of the trial court's guilt-phase jury instructions and have found nothing that can reasonably be said to have adversely affected appellant's substantial rights.

The agreed statement also indicates that there were unrecorded discussions between the parties prior to the sentencing phase of appellant's trial. The discussions apparently revolved around juror Patricia M. Jenkins and speculations that she may or may not have attended a church service wherein Reverend Bush, then a possible mitigation witness for the defense, delivered a sermon criticizing the death penalty. However, out-of-court discussions between attorneys are not "proceedings" and need not be recorded. In any event, we fail to see how appellant was even possibly prejudiced by the unrecorded discussions concerning Jenkins.

During oral arguments before this court, appellant took particular exception to a matter outlined in the agreed statement dealing with a pretrial motion to suppress and unrecorded discussions between the trial judge and one of appellant's defense attorneys concerning the merits of that motion. Because of the emphasis appellant has placed on this particular matter, we will address and discuss the issue in some detail.

On September 8, 1989, appellant filed a pretrial motion to suppress the incriminating statements he had made to Deputy Hatzer at the Franklin County Jail, and the incriminating statements made to Special Deputies Busack, Taylor

and Sesko at the Belmont County Jail. In a memorandum in support of the motion, appellant argued that the incriminating statements had been "elicited" by law enforcement officers and had not been volunteered by appellant. Appellant argued that, based on *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and its progeny, appellant should have been specifically advised by the deputies that anything appellant said to them could be used against him at trial. According to the agreed statement, the trial judge informed defense attorney Jim Nichelson in an unrecorded discussion or discussions that the motion would be denied because of the trial judge's belief that no constitutional violation had occurred. According to the agreed statement, "the court also indicated that it would hear the Motion if it had to, but that the [*sic*] there was no need to do so." Thereafter, on September 18, 1989, defense counsel withdrew the motion (during a recorded motions hearing), and the trial court issued a journal entry reflecting that the motion had been withdrawn.

At oral arguments before this court, counsel for appellant alleged that the events leading to the withdrawal of the pretrial motion to suppress have left this court "with absolutely no way to see what evidence might have been there to support the claims for the suppression." Counsel for appellant also suggested that because no hearing was ever conducted on the motion to suppress, there is now no way to determine whether the motion had any merit. Our response to these arguments is twofold.

First, the language of the agreed statement indicates that the trial court did offer to conduct a hearing on the motion if a hearing on the motion was absolutely necessary. Therefore, the fact that defense counsel withdrew the motion (apparently because he knew the motion would be denied) is *the* reason no hearing on the motion occurred. If appellant's trial attorneys believed that there was any

22

merit to the motion, we have no doubt that they would have gone forward with the motion on the record or, at the very least, would have proffered some evidence in support of the motion to suppress.

Second, a review of the recorded trial testimony of Hatzer, Busack, Taylor and Sesko demonstrates, rather convincingly, that appellant's claims of prejudice lack merit. *Miranda* applies in situations involving custodial *interrogation* by law enforcement officials, and there is simply no suggestion from the evidence of record that *Miranda* and its progeny were violated in this case. Special Deputy Busack testified at trial that appellant began talking about the crimes while Busack was reading a book. Busack testified that "I tried to keep my mind on the book, but I could not overlook the fact that he [appellant] was talking. So I would periodically listen to him and close the book for a little bit." Special Deputy Taylor also testified that he never initiated any conversation with appellant. According to Taylor, appellant talked about the crimes while Taylor was reading and studying textbooks. Special Deputy Sesko testified at trial that he had never been ordered to engage in or to initiate any conversation with appellant, and that appellant had initiated conversations concerning the murders. Accordingly, the evidence of record strongly suggests that there was no plan or involvement of law enforcement officials to elicit any information from appellant during his incarceration, and that appellant simply volunteered his story about the crimes to whoever would listen. Under these circumstances, we believe that appellant's trial counsel reasonably chose to withdraw a meritless motion to suppress. The arguments advanced by appellate counsel are not persuasive.

With respect to the unrecorded jury view to which appellant now takes exception, the record is clear that the prosecution originally requested authorization for a jury view of the "scene of the crime." In a motion requesting

23

the jury view (which is contained in the record), the crime scene was described as (1) the general area surrounding County Road 2 where Vargo's body was discovered, and (2) an area seven-tenths of a mile south of that location "off County Road #2, approximately 300 feet in a field." The second area referred to in the motion apparently sought to describe the general location where Sponhaltz's body and truck were discovered by police. At a recorded hearing on the motion, the assistant prosecuting attorney stated that the requested jury view was to encompass two separate scenes: "County Road 2 and to the location where the Vargo body was, further down where the Sponhaltz body was." This statement may have resulted in some confusion, since Sponhaltz's body was only fifty feet from Vargo's body at some point during the sequence of the murders, but Sponhaltz's body was *also* later abandoned off County Road 2 approximately seven-tenths of a mile away from Vargo's body. In any event, the trial court granted the motion on the record, and defense counsel entered no objection. Defense counsel did not request recordation of the jury view, and the trial court did not order that the jury view be recorded.

The agreed statement indicates that during the unrecorded jury view, the jury was taken to certain areas that had not been requested by the prosecution and approved in advance by the trial court. These areas included the location near Legion Road in St. Clairsville where the victims' wallets and personal effects had been discovered, and the Glen Robbins Road area near George Goolie's residence and near the Polish League of American Veterans Club (the "PLAV Club") that Sponhaltz had visited prior to the murders. Defense counsel apparently objected to the jury's view of these areas. The jury was also taken to the area where Sponhaltz's body and truck had been discovered by police, and the agreed statement indicates that defense counsel also objected to the viewing of that area.

24

Following the jury view, defense counsel specifically objected on the record to the jury's view of two particular areas, *i.e.*, the "Legion Road area of St. Clairsville" (where the victims' personal effects had been found), and "the Glen Robbins Road area, Pease Township" (the area encompassing George Goolie's residence and the PLAV Club). The trial court overruled these objections on the record.

Appellant argues that he was prejudiced by the trial court's failure to order recordation of the jury view. However, appellant has failed to demonstrate how the jury's view of the additional (but relevant) areas rises to the level of prejudice. In his brief, appellant argues that "[b]ecause the record is without a transcript of the jury view, there is no indication as to what occurred and, thus, no way a meaningful review on appeal can be accomplished. Accurate restoration is impossible." We disagree. The record is more than adequate to show that the jury viewed some areas that had not been approved in advance by the trial court. Objections were made on the record to the jury's view of all or some of the areas in question. The trial court overruled the objections. We find no abuse of discretion in this regard. Additionally, the trial court specifically instructed the jury (on two separate occasions) that a jury view is not evidence. Upon a full consideration of the record and the agreed statement, we find no evidence of any prejudice resulting from the unrecorded jury view.

In this proposition, appellant also suggests that he might have been absent from certain in-chambers conferences. As to six in-chambers conferences, the agreed statement indicates that the parties or individuals interviewed for purposes of creating the agreed statement had insufficient recollection to say whether appellant was actually present for the conferences or whether he had specifically waived his right to be present. Admittedly, appellant was absent from at least one of the conferences specifically mentioned in paragraph nine of the agreed

statement. However, even *if* appellant was not present for any of the conferences in question, defense counsel clearly was present to represent appellant's interests. Additionally, no timely objection was made to appellant's absence from any of the conferences listed in the agreed statement. Appellant's failure to timely object to his absences constituted a waiver of his right to be present. See *State v. Williams* (1983), 6 Ohio St.3d 281, 287, 6 OBR 345, 350, 452 N.E.2d 1323, 1330. Curiously, appellant advances no specific arguments concerning his alleged absences but, rather, simply states in his brief that "the record does not establish that the defendant was present during all of the critical stages of the proceedings," and that "[p]owerful inferences are easily drawn from a record which is missing such blatantly significant information." Since the inferences to which appellant refers are not readily apparent in the context of his first proposition of law, we reject appellant's "powerful inferences" argument without further comment.

The court of appeals reviewed the record in this case and found it to be adequate for appellate review. The court of appeals held that "[t]hough appellant's record is not absolutely complete, appellant did not request that the off-the-record proceedings be recorded, and did not demonstrate to this court how he was prejudiced by the lack of such proceedings in the record on review." Therefore, the court of appeals rejected appellant's arguments involving the incompleteness of the record. We concur in the court of appeals' judgment on this issue. Upon a careful review of the record, including the agreed statement, we find that the record in this case is quite adequate for appellate review.

Accordingly, for all of the foregoing reasons, we reject appellant's first proposition of law.

III

During the guilt phase, the trial court gave the following charge to the jury concerning evidence and permissible inferences:

"Evidence may be direct or circumstantial. Direct evidence is the testimony given by a witness who has seen or heard the facts to which he testifies. Circumstantial evidence is proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow according to the common experience of mankind.

"To infer or *to make an inference is to reach a reasonable conclusion of fact* which you may make but are not required to make *from other facts which you find have been established by direct evidence.* Whether an inference is made rests entirely with you. The view of the scene, the opening statements and the closing arguments of counsel are designed to assist you but are not evidence." (Emphasis added.)

In his second proposition of law, appellant argues that the trial court's instruction to the jury concerning inferences was incomplete and erroneous. Specifically, appellant argues that the jury was improperly allowed to draw one inference from another to reach an ultimate determination of fact that appellant had specifically intended to kill his victims. Therefore, appellant urges that his aggravated murder convictions and death sentence must be reversed and that a new trial must be ordered. We disagree.

Initially, we note that appellant never objected on the record to the trial court's instruction on inferences. Therefore, appellant has waived all but plain error in connection with the trial court's instruction on inferences. Nevertheless, appellant urges that the alleged error was properly preserved for appellate review because the agreed statement indicates that one of appellant's defense attorneys might have made objections or requests pertaining to jury instructions during an

27

unrecorded conference, and because trial counsel could not recall the objections or requests that were actually made. However, we find that the agreed statement falls short of preserving the alleged error involving the trial court's instruction on inferences. To properly preserve the issue, an objection should have been made on the record at the time appellant lodged objections to other aspects of the trial court's charge to the jury. Moreover, and in any event, regardless of whether this court invokes the plain-error analysis of Crim.R. 52(B), the harmless error analysis of Crim.R. 52(A), or any other analysis concerning the alleged error, it is clear that appellant suffered no prejudice (and, in fact, may have benefited) from the instruction at issue.

Appellant contends that the trial court's instruction on inferences was insufficient and erroneous because the trial court did not also instruct the jury that an inference could not be based on another inference. However, appellant's argument that an inference cannot be based on another inference is only partially correct. As we stated in *Hurt v. Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 329, 58 O.O. 122, 130 N.E.2d 820, paragraphs one and two of the syllabus:

"1.  An inference based solely and entirely upon another inference, unsupported by any additional fact or another inference from other facts, is an inference on an inference and may not be indulged in by a jury.

"2.  An inference which is based in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in by a jury."

Here, the trial court's instruction on inferences did *not* permit the jury to make an inference based solely or entirely upon another inference. In fact, the instruction did not even go as far as it could have gone in permitting the jury to consider "parallel inferences." The trial court specifically instructed the jury that inferences could be made only from *facts* the jury found to have been established

28

by direct evidence. Thus, the instruction was somewhat narrow on the subject of inferences, which might explain why defense counsel raised no objection on the record concerning the instruction. In any event, we are not persuaded by appellant's suggestions that the jury might have based one unsubstantiated inference upon another to reach a conclusion on appellant's specific intent to kill. Appellant's theory in this regard is not supported by the language of the trial court's instruction to the jury. Appellant notes, however, that the prosecutor made certain arguments to the jury concerning inferences. Although these arguments were made, the arguments of counsel are not evidence, and the trial court specifically instructed the jury in that regard. Additionally, the *trial court,* not the prosecuting attorney, instructs the jury on the law. We find nothing improper in the trial court's instruction on inferences.

Moreover, we specifically reject the notion that the jury drew one impermissible inference from another to reach a conclusion that appellant specifically intended to kill his victims. The jury's findings of intent were based on the direct evidence of two bullet holes in Sponhaltz's head, one bullet hole in the left side of Vargo's head, one bullet hole in the right side of Vargo's head (with that shot having been fired from a distance of less than two feet), appellant's various admissions concerning his specific intent to kill, and the evidence concerning the type of weapon used by appellant. The fact that the trial court gave no additional instruction on inferences was of no consequence and clearly had no effect on the outcome of appellant's trial.

Appellant also argues that "the trial court failed to instruct the jury that if an inference which supported guilt was drawn from underlying facts, the inference must be so strong so as to exclude an inference from the same facts which supported innocence." However, in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574

29

N.E.2d 492, paragraph one of the syllabus, this court *rejected* the notion that evidence supporting a conviction must be irreconcilable with any reasonable theory of innocence. Our position on that issue has not changed.

Accordingly, appellant's second proposition of law is not well taken.

IV

In his fifth proposition of law, appellant contends that the trial court erred by refusing to instruct the jury on involuntary manslaughter as a lesser included offense of aggravated murder. However, "[e]ven though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus.

Here, under any reasonable view of the evidence, the killing of both Sponhaltz and Vargo was purposeful. Appellant fired two shots into the left side of Sponhaltz's head. He shot Vargo in the right side and in the left side of the head, with one of the shots having been fired from point-blank range.

At trial, appellant claimed that he did not know he was carrying the pistol until it accidentally discharged when appellant attempted to strike Sponhaltz with a hand or fist. Appellant also claimed that he killed Sponhaltz and Vargo in the "panic" and "mass confusion" that followed the first "accidental" shot. However, the placement of the shots fired into Sponhaltz's head, and the paths of the projectiles through Sponhaltz's brain, clearly show the absence of any accident or mistake. Moreover, the alleged accidental shot and appellant's alleged intoxication do not even begin to explain the second shot fired into Sponhaltz's head, which was fired with unmitigated accuracy. Appellant's claims of panic and

confusion are thoroughly refuted by the location and placement of the shots fired into Sponhaltz's head, and the location and placement of the shots fired into the left and into the right side of Vargo's head. Both victims were killed execution-style with a single-action revolver. The evidence concerning the type of weapon used by appellant demonstrated that the hammer mechanism had to be pulled back and cocked, and the trigger then pulled, for each round fired. Appellant's claims of accident, panic, and confusion are wholly inconsistent with the evidence. Additionally, contrary to appellant's assertions, no reasonable juror could have believed that these killings were the accidental byproduct of an aggravated robbery gone wrong. The number and location of the victims' wounds would lead any reasonable trier of fact to conclude that appellant acted purposefully in causing the death of each victim.

We find that the evidence adduced at trial could not have reasonably supported both an acquittal on aggravated murder and a conviction on the charge of involuntary manslaughter. Therefore, the trial court correctly rejected appellant's request for an involuntary manslaughter instruction. Accordingly, appellant's fifth proposition of law lacks merit.

V

In his sixth proposition of law, appellant contends that the trial court committed reversible error by refusing to instruct the jury on the issue of self-defense. Since self-defense is an affirmative defense, the burden of going forward with the evidence on the issue, and the burden of proof for the affirmative defense, rested entirely upon appellant. See R.C. 2901.05(A). In *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph two of the syllabus, this court held:

"To establish self-defense, the following elements must be shown: (1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger. (*State v. Melchior* [1978], 56 Ohio St.2d 15 [10 O.O.3d 8, 381 N.E.2d 195], approved and followed.)" See, also, *State v. Thomas* (1997), 77 Ohio St.3d 323, 326, 673 N.E.2d 1339, 1342.

We find that the trial court properly refused to instruct the jury on the issue of self-defense. In *Melchior*, *supra*, paragraph one of the syllabus, this court held that "[t]he proper standard for determining in a criminal case whether a defendant has successfully raised an affirmative defense under [former] R.C. 2901.05 is to inquire whether the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue."

Here, no reasonable jury could possibly believe that appellant used deadly force in good faith to defend himself or Hill against two unarmed men or that appellant or Hill satisfied any duty to retreat. Appellant did not produce sufficient evidence on the issue. Appellant argues, however, that he simply attempted to strike Sponhaltz, not kill him, and that the pistol accidentally discharged. Therefore, according to appellant, Sponhaltz's death resulted from appellant's proper use of nondeadly force. We find appellant's argument to be nothing short of ridiculous. The fact that appellant used deadly force is convincingly demonstrated by the two gunshot wounds to the head of each victim. Moreover, even if, as appellant suggests, he was justified in attempting to strike Sponhaltz with his fist and that the pistol appellant was carrying happened to accidentally

32

discharge, appellant's act of firing a second shot into Sponhaltz's head, and his act of firing two shots into Vargo's head, were certainly not warranted.

The evidence at trial was insufficient to support an instruction on self-defense, and the trial court properly refused to instruct the jury on that issue. Accordingly, we reject appellant's sixth proposition of law.

VI

Appellant's ninth proposition of law concerns the .22 caliber pistol that was admitted into evidence as a demonstrative exhibit. The circumstances surrounding the admission of that exhibit are as follows.

During the state's case-in-chief, the prosecution produced two weapons as state's exhibit 29, a .22 caliber pistol with the word "Eureka" inscribed on the top of the weapon, and the .32 caliber pistol with the word "Defender" inscribed on top. Deputy Fred Thompson identified the two weapons as having been acquired from Mr. Fox in Martins Ferry. On cross-examination, Thompson testified that the two weapons were not the weapons used in the homicides. Thompson testified that the two pistols were offered as being similar to the type of weapon used in the murders. Thompson explained that the pistols in state's exhibit 29 had been acquired on information from Cammy Palmer that the weapon appellant had referred to in a May 15, 1989 telephone conversation with Thompson had been part of a matched set of weapons owned by Fox. Later, during the state's case-in-chief, Sheriff Thomas McCort of Belmont County testified concerning the operation of the two weapons contained in state's exhibit 29. McCort's testimony was offered to refute suggestions by the defense that Sponhaltz's murder may have been accidental. On cross-examination, McCort testified that neither weapon in state's exhibit 29 was the actual murder weapon. On redirect examination, McCort explained that the weapons had been obtained from Fox based upon

33

information that the actual murder weapon had been part of a matched set belonging to Fox. McCort testified that Fox told police that he was missing a .22 caliber weapon from a matched set, and that the missing weapon had the word "Defender" inscribed on it.

At the conclusion of the state's case-in-chief, the prosecution sought to have state's exhibit 29 admitted into evidence. However, defense counsel argued against the admission of the exhibit, stating: "The evidence indicates these are not the weapons used; they do not, in fact, match any other weapons because our understanding is there's something about a 'Defender' that does not appear on the .22 caliber. Therefore, it is not a matched set of any kind, and there has been no testimony from Mr. Fox at all to link these particular weapons * * * with anything that might have been used by Mr. Palmer." On the basis of this argument, the trial court refused to admit the exhibit into evidence. However, appellant later testified on cross-examination that the .22 caliber weapon in state's exhibit 29 was "similar" to the weapon used in the murders. Appellant testified that when he borrowed the murder weapon from Cammy Palmer in April 1989, Cammy told appellant that Fox "owned a match to the gun." Appellant testified further that the hammer on both the murder weapon and the .22 caliber pistol in state's exhibit 29 had to be pulled back before the trigger was pulled in order to fire. Appellant also indicated that the murder weapon could not have accidentally fired without the hammer having been pulled back and cocked. After appellant testified, the state once again moved to have the .22 caliber pistol in state's exhibit 29 admitted into evidence as a demonstrative exhibit. After hearing arguments on the matter at a recorded conference, the trial court admitted the .22 caliber pistol into evidence and instructed the jury as follows:

"Ladies and gentlemen, after you were excused Tuesday, the court admitted Exhibit 29 which is the .22 revolver. As being admitted, it's being admitted for a limited purpose only. I want to explain it to you. It's being admitted because it was testified by the defendant it was similar to the gun used to kill the two victims. It is not the gun used as it is being admitted simply because it's similar, and the method of firing, by pulling back the hammer and pulling back the trigger is the same as the method that was used in the two killings. That is the limited purpose only. You are not to consider the effort or the energy used to pull back the hammer or the energy used to pull the trigger because it may or may not be similar in force as to the actual gun. It is only for a demonstration of how the gun and what you had to do to fire the gun."

Appellant contends that the exhibit was not properly authenticated under Evid.R. 901(A), and that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Therefore, appellant contends that the exhibit should have been excluded from the evidence, and that its admission into evidence requires reversal and a new trial. Appellant's arguments are not persuasive.

The trial court did not abuse its discretion in admitting the .22 caliber revolver into evidence as a demonstrative exhibit. Contrary to appellant's assertions, the state never claimed that the exhibit was the actual murder weapon or was anything other than a demonstrative exhibit. Thus, appellant's arguments that the exhibit was never properly authenticated as the murder weapon lacks merit. Additionally, the fact that state's exhibit 29 did not contain the actual murder weapon was made extremely clear to the jury. The prosecution claimed only that the .22 caliber revolver was a demonstrative exhibit and that it was similar to the murder weapon. According to appellant's trial testimony, the

35

murder weapon, like the demonstrative exhibit, required that the hammer be pulled back and cocked for the weapon to fire. In this regard, the demonstrative evidence was relevant on questions such as intent, purpose, prior calculation and design, and the absence of accident or mistake. The trial court admitted the revolver only as a demonstrative exhibit and with a specific limiting instruction. Although a danger of unfair prejudice might have existed because the effort or energy needed to pull back the hammer and to pull the trigger on the state's exhibit may not have been the same level as on the actual murder weapon, that danger was entirely eliminated by the trial court's instruction to the jury. We presume that the jury followed the trial court's limiting instruction regarding the demonstrative evidence.

We find no abuse its discretion in the admission of the demonstrative exhibit. Accordingly, we reject appellant's ninth proposition of law.

VII

In his thirteenth proposition of law, appellant contends that the evidence was not sufficient to sustain his convictions on the four counts of aggravated murder, the two counts of aggravated robbery, and the R.C. 2929.04(A)(7) specifications of aggravating circumstances premised upon aggravated robbery. We disagree.

In this proposition, appellant essentially asks us to resolve all evidentiary conflicts in his favor. However, in reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic*.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573. Additionally, this court "may weigh evidence only to determine whether it is of

36

sufficient probative force to support a finding of guilt." *Tyler*, 50 Ohio St.3d at 33, 553 N.E.2d at 589. Thus, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

Appellant argues that the evidence at trial was insufficient to show that he specifically intended to cause the death of each victim. However, we find that there was an abundance of evidence which, if accepted, clearly demonstrated that appellant specifically intended to kill Sponhaltz and Vargo. There is no question that appellant killed both men. Appellant has consistently admitted killing both victims ever since police first confronted appellant with the evidence placing appellant and Hill at the scene of the murders. Each victim was shot twice. There were two bullet holes in the left side of Sponhaltz's head, one bullet hole in the left side of Vargo's head, and one bullet hole in the right side of Vargo's head. The shot fired into the right side of Vargo's head had been fired from a distance of less than two feet. Evidence concerning the location and nature of the victims' wounds, standing alone or in conjunction with other evidence in the record, such as the type of weapon used to accomplish the killings, appellant's confession and his various pretrial admissions, sufficiently and overwhelmingly supported the findings of specific intent.

Next, appellant contends that the evidence was insufficient to sustain his convictions on the two counts of aggravated murder charging violations of R.C. 2903.01(A). Specifically, appellant argues that the state failed to prove that he acted with "prior calculation and design" in causing the deaths of his victims. In *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph one of the syllabus, this court recognized that " 'prior calculation and design' is a

more stringent element than the 'deliberate and premeditated malice' which was required under prior law." In *Cotton*, paragraph three of the syllabus, we held that "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." However, "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.' " *Id*. at paragraph two of the syllabus.

Recently, in *State v. Taylor* (1997), 78 Ohio St.3d 15, 18-20, 676 N.E.2d 82, 88-89, we reviewed the history and meaning of the phrase "prior calculation and design." We concluded, based upon a review of Ohio case law dealing with the issue, that "it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' " *Id*. at 20, 676 N.E.2d at 89. In *Taylor*, Michael M. Taylor shot an acquaintance several times in the thighs and torso with a semiautomatic .9 mm pistol. Several shots had been fired while the victim was standing, and several other shots were fired after the victim fell to the floor. The killing occurred after a brief (two- to three-minute) argument in a bar. In *Taylor*, we determined that the evidence was more than sufficient to support the finding of prior calculation and design. *Id*. at 20-23, 676 N.E.2d at 89-91. Today, we reach a similar conclusion on the facts and circumstances of the case at bar.

The evidence indicates that Sponhaltz was driving in front of Hill's vehicle on County Road 2. Both vehicles drove past George Goolie's residence at the corner of County Road 2 and Glen Robbins Road. After the vehicles had passed Goolie's residence, Sponhaltz suddenly slowed down or stopped in the roadway.

Hill's vehicle struck the rear of Sponhaltz's pickup truck. The record is unclear why Sponhaltz would have slowed down or stopped in the roadway. However, when appellant confessed to the murders, appellant told police that he was "almost positive" that Sponhaltz had purposely caused the collision.

Following the accident, Sponhaltz and Hill got out of their vehicles and, according to appellant, Sponhaltz started an argument with Hill. Appellant then got out of Hill's car with a loaded .22 caliber single-action revolver. The evidence at trial was sufficient to show that the type of weapon used by appellant could not have been fired unless the hammer mechanism was first pulled back and cocked. Appellant conceded that the gun must have been cocked and ready to fire when he allegedly struck Sponhaltz. He also testified that he had no idea that the gun was in his hand when he got out of the car. Construing the evidence in the light most favorable to the prosecution, any rational juror could have concluded beyond a reasonable doubt that the gun was cocked and ready to fire when appellant got out of the car. Appellant claimed that he ultimately shot Sponhaltz once by mistake and a second time as a result of confusion. However, the fact that appellant got out of Hill's vehicle with a loaded pistol that was cocked and ready to fire gives rise to the inference that appellant intended to use that weapon. That inference is also independently supported by the fact that appellant shot Sponhaltz twice in the head in an execution-style killing.

According to appellant's trial testimony, appellant got out of Hill's vehicle with the loaded pistol and assessed the damage to each vehicle. Meanwhile, according to appellant, Sponhaltz continued "ranting and raving." Appellant testified that Sponhaltz then attempted to grab Hill and, when appellant swung at Sponhaltz, the pistol in appellant's hand "went off." However, the evidence at trial concerning the type of weapon used by appellant indicated that the weapon

39

could not have discharged unless the hammer was pulled back and cocked *and* the trigger was then pulled.

Appellant's confession to police and his trial testimony indicate that a total of three shots may have been fired at Sponhaltz. The evidence at trial demonstrates that Sponhaltz was shot twice in the head. Thus, if three shots were fired, one of the shots obviously missed Sponhaltz, and the missed shot could have been either the first, second or the third shot fired. For each round fired, appellant had to pull back and cock the hammer mechanism, and then pull the trigger. Additionally, if three shots were fired at Sponhaltz, it is reasonable to assume that Sponhaltz was shot once while he was standing and once after he fell to the ground or, alternatively, that appellant fired both shots into Sponhaltz's head after Sponhaltz fell to the ground. During his confession, appellant told police that he shot Sponhaltz twice after Sponhaltz fell to the ground and that he knew the shots would kill Sponhaltz. Evidence was also presented which, if believed, reveals that appellant told Special Deputy David Taylor that he shot Sponhaltz and that he then "shot him again to make sure he was dead."

Upon a review of all the facts and circumstances surrounding Sponhaltz's death, we find that the evidence in this case was clearly sufficient for any rational trier of fact to conclude that appellant had engaged in more than a mere "instantaneous deliberation" with respect to Sponhaltz's murder. The evidence, when viewed in a light most favorable to the state, was more than sufficient to show that appellant had adopted a plan to kill Sponhaltz prior to exiting Hill's vehicle and that, with a level of precision, appellant followed through on his calculated decision to kill.

The evidence of prior calculation and design with respect to Vargo's murder is even more compelling. At trial, appellant claimed that after he shot Sponhaltz,

he backed away from the scene, turned, and came face-to-face with Vargo. Appellant testified that, without thinking, he simply "pulled the trigger" and Vargo was dead. However, during his confession, appellant told police a different story. Appellant told police that after shooting Sponhaltz, appellant went back to Hill's vehicle. Hill then asked appellant to help load Sponhaltz's body into the bed of the pickup truck. While appellant and Hill were loading Sponhaltz's body into the bed of the truck, Vargo pulled up to the scene, backed up, and parked his vehicle behind Hill's vehicle. Appellant then walked to the back of Hill's vehicle and shot Vargo in the head. With respect to Vargo's murder, there was also evidence at trial which, if believed, reveals that appellant admitted killing Vargo because appellant had feared that Vargo may have witnessed the first shooting.

Appellant's trial testimony that he backed away from Sponhaltz's body, turned, and ran directly into Vargo is also entirely inconsistent with the physical evidence at the scene of the homicides. Vargo's body was found approximately fifty feet from the location where Sponhaltz had apparently been shot. Therefore, unless appellant backed away from Sponhaltz's body for some fifty feet before he allegedly turned and ran directly into Vargo, appellant's story at trial was suspect and could have been disregarded by any rational trier of fact. Further, appellant's claim at trial that he simply "pulled the trigger" in order to kill Vargo was inconsistent with the evidence concerning the type of weapon appellant used to kill his victims. The evidence at trial concerning the type of weapon used by appellant would have made it impossible for him to have simply "pulled the trigger" to kill Vargo. Rather, appellant would have had to pull back and cock the hammer mechanism, and then pull the trigger, for each shot fired. Moreover, Vargo was shot in an execution-style manner. He was shot once in the left side of

41

head in the temple, and once in the right side of the head in the temple. The shot fired into the right side of Vargo's head had been fired from point-blank range.

Although there may be no "bright-line test" that emphatically distinguishes between the presence and absence of prior calculation and design, we find that the evidence in this case, when viewed in a light most favorable to the prosecution, was more than sufficient for any reasonable jury to conclude that appellant acted with prior calculation and design in causing the death of each victim. The events giving rise to the death of each victim may have been of a short duration, but the duration of the events was quite long enough for appellant to have conceived of, adopted, and executed a calculated plan to kill each victim. The credibility of the witnesses was a matter for the jury to determine, and this jury apparently disbelieved much of appellant's trial testimony concerning the events leading up to and culminating in the death of each victim.

Appellant also argues that the evidence was insufficient to sustain his convictions for aggravated (felony) murder, aggravated robbery, and the R.C. 2929.04(A)(7) specifications of aggravating circumstances premised on aggravated robbery because, according to appellant, he never had any intention to steal anything from either victim before the shootings. In this regard, appellant urges that the term "while," as that term appears in R.C. 2903.01(B) and 2929.04(A)(7), requires proof that he intended to rob his victims at the time he killed them. However, in prior cases, this court has rejected any notion that R.C. 2903.01(B) and 2929.04(A)(7) require proof that the offender formed the intent to commit the pertinent underlying felony before or during the commission of the acts which resulted in the murder victim's death. See, *e.g.*, *State v. Williams* (1996), 74 Ohio St.3d 569, 576-578, 660 N.E.2d 724, 732-733, and *State v. Biros* (1997), 78 Ohio St.3d 426, 449-451, 678 N.E.2d 891, 910-912. In *Williams*, we

42

held, "Neither the felony-murder statute nor Ohio case law requires the intent to commit a felony to precede the murder in order to find a defendant guilty of a felony-murder specification." *Id.* at paragraph one of the syllabus. Additionally, in *Williams*, we stated:

"This court has had occasion to explain the meaning of the word 'while' with respect to R.C. 2903.01(B), stating:

" ' "The term 'while' does not indicate * * * that the killing must occur at the same instant as the [underlying felony], or that the killing must have been caused by [it], but, rather, indicates that the killing must be directly associated with the [underlying felony] as part of one continuous occurrence * * *." * * *' *State v. Cooey* (1989), 46 Ohio St.3d 20, 23, 544 N.E.2d 895, 903, quoting *State v. Cooper* (1977), 52 Ohio St.2d 163, 179-180, 6 O.O.3d 377, 386, 370 N.E.2d 725, 736." *Williams*, 74 Ohio St.3d at 577, 660 N.E.2d at 733.

Here, the evidence indicates that wallets and personal effects were taken from Sponhaltz and Vargo just after they were shot. Additionally, both victims had been seen with money prior to the murders, but no money was ever found by police. A reasonable jury could have concluded that appellant played a role in the robbery of these various items. Moreover, appellant admitted during his confession that he personally took money from Sponhaltz, although he later changed his story at trial.

Viewing the evidence in this case and the reasonable inferences to be derived therefrom in a light most favorable to the prosecution, it is clear that any rational trier of fact could have found that appellant committed the aggravated robbery[4] offenses beyond a reasonable doubt. The evidence was sufficient to show that appellant committed a "theft offense" as that term is defined in R.C. 2913.01(K)(1) (see R.C. 2913.02[A][1]) and that appellant had a deadly weapon

43

on or about his person the entire time. R.C. 2911.01(A)(1). Additionally, appellant inflicted "serious physical harm" within the meaning of former R.C. 2911.01(A)(2) (now found in R.C. 2911.01[A][3]), and the question whether he killed before he stole or stole before he killed is of no consequence. "[T]he victim of a robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation." *State v. Smith* (1991), 61 Ohio St.3d 284, 290, 574 N.E.2d 510, 516. Moreover, and in any event, the evidence at trial indicated that each of the victims may have been alive for a period of minutes after the shootings and, thus, they certainly could have been alive at the time of asportation.

The evidence was also sufficient to a support a finding that the killings were "associated with" the aggravated robberies "as part of one continuous occurrence." *Williams*, 74 Ohio St.3d at 577, 660 N.E.2d at 733. Appellant's intent to steal "need not have preceded the murder[s] for purposes of R.C. 2903.01(B) and 2929.04(A)(7)," and he cannot now "escape the effect of the felony-murder rule by claiming that the aggravated robbery was simply an afterthought." *Biros,* 78 Ohio St.3d at 451, 678 N.E.2d at 912.

Upon a careful review of the record, we are convinced that the evidence established appellant's guilt, on all charges and specifications, beyond a reasonable doubt. Therefore, we reject appellant's thirteenth proposition of law.

VIII

In his fourteenth proposition of law, appellant contends that the trial court erred in permitting the jury to consider four counts of aggravated murder during the penalty phase, *i.e.*, two counts of aggravated murder for each victim. Appellant suggests that the prosecution should have been required to elect, before the penalty phase, which two counts of aggravated murder (one count for each

44

killing) were to be submitted to the jury for sentencing. Appellant argues that the jury might have considered the multiple counts of aggravated murder for each killing as nonstatutory aggravating circumstances, and that the multiple counts might have "created [an impression] in the mind of the jurors that the deaths were especially heinous because of the number of charges stemming from the deaths." However, appellant's arguments are entirely speculative and lack merit. The jury in this case was specifically instructed concerning the aggravating circumstances pertaining to each separate count of aggravated murder, and these were the only aggravating circumstances considered by the jury. Additionally, the court of appeals found that although appellant was charged with and convicted of two counts of aggravated murder for each killing, the trial court "imposed only a single death penalty and, therefore, only one judgment of conviction." Since the trial court imposed only a single death penalty, we reject appellant's fourteenth proposition of law on authority of *State v. Woodard* (1993), 68 Ohio St.3d 70, 78-79, 623 N.E.2d 75, 81; *State v Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70, 82; *State v. Waddy* (1992), 63 Ohio St.3d 424, 447, 588 N.E.2d 819, 836; and *State v. Poindexter* (1988), 36 Ohio St.3d 1, 5, 520 N.E.2d 568, 572.

In his twentieth proposition of law, appellant reminds us of the rule set forth in *State v. Cooey*, *supra,* 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus: "When a capital defendant is convicted of more than one count of aggravated murder, the penalty for each individual count must be assessed separately. Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count." Appellant argues that the trial court failed to properly instruct the jury in this regard. However, we reject appellant's arguments for three reasons. First, appellant's claims of prejudicial error are, once again, purely speculative. Second, contrary to appellant's

45

assertions, the trial court's sentencing instructions made it very clear that the jury was to consider each count of aggravated murder separately, and that only the aggravating circumstances related to a given count were to be weighed against the mitigating factors. Third, the jury's verdict forms make it abundantly clear that the jury considered each count of aggravated murder separately, and that only the aggravating circumstances relevant to each individual count were weighed against the mitigating factors. Therefore, appellant's twentieth proposition of law lacks merit.

Accordingly, appellant's fourteenth and twentieth propositions of law are not well taken.

IX

Appellant was found guilty of two specifications of aggravating circumstances in connection with each of the four counts of aggravated murder. The first specification common to each count of aggravated murder was based on R.C. 2929.04(A)(5) and alleged that "the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." The second specification common to each count of aggravated murder was based on R.C. 2929.04(A)(7), and alleged that "the offense at bar was committed while the offender was committing, attempting to commit, or fleeing immediately after committing, aggravated robbery, and either the offender was the principal offender in the commission of the aggravated murder, or if not the principal offender, committed the aggravated murder with prior calculation and design." Additionally, appellant was found guilty of an R.C. 2929.04(A)(3) death penalty specification in connection with Count Six of the indictment. Count Six pertained to the aggravated (felony) murder of Vargo. The R.C. 2929.04(A)(3) specification in connection with that count alleged that "the offense at bar was

committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender."

In his nineteenth proposition of law, appellant contends that the R.C. 2929.04(A)(5) and (A)(7) specifications of aggravating circumstances in each count of aggravated murder should have been merged prior to the penalty phase since, according to appellant, the specifications were duplicative. Appellant also suggests that the R.C. 2929.04(A)(3) specification in connection with the aggravated (felony) murder count pertaining to Vargo should have been merged with the other two specifications of aggravating circumstances in connection with that count because, according to appellant, all three aggravating circumstances were duplicative. However, appellant did not request merger at trial and, thus, his assertions of error have been waived. Further, on the merits, appellant's arguments are not persuasive, with only one minor exception.

In *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus, this court held that:

"In the penalty phase of a capital prosecution, where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing. Should this merging of aggravating circumstances take place upon appellate review of a death sentence, resentencing is not automatically required where the reviewing court independently determines that the remaining aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and that the jury's consideration of duplicative aggravating circumstances in the penalty phase did not affect the verdict."

The R.C. 2929.04(A)(5) and (A)(7) specifications are not duplicative, since they did not arise from the same act or indivisible course of conduct. The R.C.

47

2929.04(A)(7) specification in each count arose from the commission of an aggravated robbery, whereas the R.C. 2929.04(A)(5) multiple murder specification arose from the commission of another killing. Under these circumstances, no merger was required. See, generally, *State v. Frazier* (1991), 61 Ohio St.3d 247, 256, 574 N.E.2d 483, 490. Additionally, on the facts of this case, we find that the R.C. 2929.04(A)(3) specification is clearly not duplicative of both of the specifications with which it was joined in Count Six of the indictment.

However, we do find that the R.C. 2929.04(A)(3) and (A)(5) specifications of aggravating circumstances in connection with Count Six arose from the same act or indivisible course of conduct, *i.e.*, the killing of Vargo. Thus, those two aggravating circumstances are duplicative and could have been merged prior to the penalty phase. Nevertheless, the jury's consideration of the duplicative aggravating circumstance does not warrant reversal of appellant's death sentence. By all indications, the duplicative aggravating circumstance in Count Six of the indictment had absolutely no impact on the jury's sentencing recommendation. In this regard, we note that the jury did recommend a death sentence in connection with another count of aggravated murder pertaining to Vargo (Count Four) without considering an R.C. 2929.04(A)(3) specification on that count during sentencing. Moreover, given the dearth of mitigating evidence, it is clear to us that the outcome of appellant's trial would not have been any different had the R.C. 2929.04(A)(3) and (5) specifications of aggravating circumstances been merged prior to the penalty phase. We have reviewed the entire record and we are confident that the capital sentencing decision was not arbitrary or capricious, despite appellant's claims to the contrary.

Additionally, this court can cure any error related to duplicative specifications of aggravating circumstances by merging the R.C. 2929.04(A)(3)

48

and (A)(5) specifications as part of our independent sentencing review. See, *e.g.*, *Cook*, 65 Ohio St.3d at 527-528, 605 N.E.2d at 82-83. For purposes of our independent review, we have merged the R.C. 2929.04(A)(3) specification into the (A)(5) specification for Vargo's death and, for each killing, we have considered only two specifications of aggravating circumstances, *i.e.*, the R.C. 2929.04(A)(5) and (A)(7) aggravating circumstances applicable to each victim. See discussion in Part X, *infra*. Our independent review has produced no different outcome despite the merger of the R.C. 2929.04(A)(3) and (A)(5) aggravating circumstances. *Id.* Thus, there is no plain error, and reversal is clearly not mandated here.

Accordingly, we reject appellant's nineteenth proposition of law.

X

Having considered appellant's propositions of law, we must now independently review the death sentence for appropriateness and proportionality. Again, we find that all specifications of aggravating circumstances of which appellant was found guilty were proven beyond a reasonable doubt.

For purposes of our independent review, we have merged both counts of aggravated murder for each victim, and we have also merged the R.C. 2929.04(A)(3) specification into the R.C. 2929.04(A)(5) specification for Vargo's death. Therefore, for each killing, we are left with two specifications of aggravating circumstances, *i.e.*, one R.C. 2929.04(A)(5) specification and one R.C. 2929.04(A)(7) specification, which are clearly shown on the record before us.

During the penalty phase, appellant presented no evidence regarding the mitigating factors set forth in R.C. 2929.04(B)(1), (2), (3), and (6), and our review of the record reveals that these factors are inapplicable here.

In mitigation, appellant presented evidence concerning his history, character, and family background. Appellant grew up without the benefit of a

strong father figure. Appellant's natural father left home when appellant was an infant. During childhood and throughout high school, appellant attended church and was considered by his friends and family members to be a truthful, considerate, nonviolent, sentimental, loving, and well-behaved young man. Appellant married Cammy Palmer in 1983 and two children were born as issue of the marriage. In 1988, appellant's marriage to Cammy ended in divorce. Appellant had great difficulties dealing with the break-up of the marriage. The evidence also indicates that appellant has a history of substance abuse.

From a review of the record, it is clear to us that appellant's childhood and his early adult life were less than ideal. However, his background appears to be no different from the background of countless other people in today's society who do not rob and kill. We find that the evidence of appellant's history, character, and family background is entitled to very little, if any, weight in mitigation.

Appellant testified in mitigation and expressed remorse for having killed Sponhaltz and Vargo. Additionally, appellant consulted with Minister Keith Groves while awaiting trial in this case and, according to Groves, appellant was very remorseful. We assign this evidence some, but very modest, weight in mitigation.

Dr. Newton L.P. Jackson, Jr., a psychologist, testified in mitigation. Dr. Jackson diagnosed appellant as suffering from a "borderline personality disorder" attributable, at least in part, to appellant's lack of a strong father figure during childhood. Dr. Newton testified that appellant's personality disorder made him prone to, among other things, "the expression of sudden intense bursts of anger as well as very dramatic expressions of love." He testified that appellant's personality disorder may have had something to do with the killings, but that the disorder itself did not cause appellant to kill his victims. Indeed, Jackson testified

50

that it is common for people with borderline personality disorders to function in life without committing crimes. He also testified that the mitigating factor set forth in R.C. 2929.04(B)(3) is inapplicable in this case, meaning that at the time of the killings, appellant's psychological condition did not rise to the level of a mental disease or defect that deprived him of a substantial capacity to appreciate the criminality of his conduct or to conform to the requirements of the law.

Dr. Jackson's testimony was offered by appellant only as an R.C. 2929.04(B)(7) "other" factor. The testimony clearly does not establish the existence of an R.C. 2929.04(B)(3) mitigating factor. We find that Jackson's testimony concerning appellant's personality disorder is entitled to some, but very minimal, weight in mitigation (R.C. 2929.04[B][7]).

The R.C. 2929.04(B)(4) mitigating factor (youth of the offender) is only nominally satisfied by appellant's age (appellant was twenty-four years of age at the time of the offenses), and we assign this factor very little weight in mitigation.

The record is clear that appellant lacks a significant history of prior criminal convictions and delinquency adjudications. Therefore, we find that this R.C. 2929.04(B)(5) mitigating factor is entitled to some weight. However, the significance of this factor is substantially diminished since appellant, by his own admission, was a cocaine dealer from February 1989 through the date of the killings.

For each of these two killings, we have weighed the aggravating circumstances against the evidence presented in mitigation. For each killing, we find that the two aggravating circumstances (R.C. 2929.04[A][5] and [A][7]) easily outweigh the mitigating factors beyond a reasonable doubt.

Finally, we have undertaken a comparison of the sentence imposed in this case to those in which we have previously affirmed the death penalty. We have

51

previously upheld the death sentence in cases involving murder during the course of an aggravated robbery (see, *e.g.*, *Biros*, 78 Ohio St.3d 426, 678 N.E.2d 891; *State v. Berry* [1995], 72 Ohio St.3d 354, 650 N.E.2d 433; and *Woodard*, 68 Ohio St.3d 70, 623 N.E.2d 75), in cases involving multiple murders (see, *e.g.*, *State v. Allard* [1996], 75 Ohio St.3d 482, 663 N.E.2d 1277; *State v. Kinley* [1995], 72 Ohio St.3d 491, 651 N.E.2d 419; and *State v. Wickline* [1990], 50 Ohio St.3d 114, 552 N.E.2d 913), and in cases involving robbery-murder and multiple murders (see, *e.g.*, *State v. Hawkins* [1993], 66 Ohio St.3d 339, 612 N.E.2d 1227; and *State v. Montgomery* [1991], 61 Ohio St.3d 410, 575 N.E.2d 167). We find that appellant's death sentence is neither excessive nor disproportionate in comparison.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., concurs separately.

_____

**FOOTNOTES:**

1.    See *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

2.    Hill was tried separately for the murders and robberies of Sponhaltz and Vargo. *State v. Hill* (Mar. 22, 1995), Belmont App. No. 90-B-5, unreported, 1995 WL 138922.

3.    The jury made no finding on the R.C. 2929.04(A)(3) death penalty specification in connection with Count Four of the indictment, apparently because the specification had been inadvertently omitted from the jury's verdict form. The

52

jury did, however, find appellant guilty of the R.C. 2929.04(A)(3) specification in connection with Count Six of the indictment.

4. At the time of the offenses, former R.C. 2911.01 provided:

"(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after such attempt or offense, shall do either of the following:

"(1) Have a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code, on or about his person or under his control;

"(2) Inflict, or attempt to inflict serious physical harm on another.

"(B) Whoever violates this section is guilty of aggravated robbery, an aggravated felony of the first degree." 140 Ohio Laws, Part I, 583, 590.

_____

**PFEIFER, J., concurring.** I concur in the majority opinion and write separately to express my concern about the direction of our prior calculation and design analysis.

R.C. 2903.01(A) states that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *."

The Committee Comments relating to this section state:

"The first part of this section restates the former crime of premeditated murder so as to embody the classic concept of the planned, cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary. By judicial interpretation of the former Ohio law, murder could be premeditated even though the fatal plan was conceived and executed on the spur of the moment. * * * The section employs the phrase, 'prior calculation and design,' to indicate studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of

53

time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation." (Citation omitted.)

In this case, the prosecution failed to prove beyond a reasonable doubt that the killings of Sponhaltz and Vargo were the product of prior calculation and design. The murders were not the result of "studied care in planning or analyzing the means of the crime." Rather, they were the result of a spur of the moment decision by Palmer to kill two total strangers. Accordingly, I would dismiss Counts I and IV.

This disposition of Counts I and IV does not affect Counts III and VI, the felony-murder convictions. I join the majority opinion with respect to Counts III and VI and therefore vote to affirm the convictions and death penalty.

_____

APPENDIX

*"Proposition of Law I:* Donald Palmer's conviction and death sentence must be set aside and a new trial ordered where the record on appeal is incomplete and cannot be sufficiently completed thereby denying Donald Palmer a meaningful appellate review, as required by O.R.C. §§ 2929.03(G) and 2929.05(A), as well as the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 5, 9, 10 and 16 to the Ohio Constitution.

*"Proposition of Law II:* The trial court erred by giving an incomplete and erroneous jury instruction on inferences, thereby depriving appellant of his rights to due process of law and against cruel and unusual punishment as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 5, 10, and 16 of the Ohio Constitution.

*"Proposition of Law III:* The trial court erred by permitting the admission of evidence and argument about irrelevant and highly prejudicial 'other acts' which appellant allegedly committed against a person not named in the indictment, thereby depriving appellant of his rights to due process of law and against cruel and unusual punishment as provided by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio Constitution.

*"Proposition of Law IV:* The admission of testimony which created the innuendo of 'other acts' deprived appellant of his constitutional rights to due process [and] against cruel and unusual punishment, as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 5, 9, 10, and 16 of the Ohio Constitution.

*"Proposition of Law V:* The trial court erred by denying appellant's request for an instruction on the lesser included offense of involuntary manslaughter, thereby depriving appellant of his constitutional rights to due process against cruel and unusual punishment, as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 5, 9, 10, and 16 of the Ohio Constitution.

*"Proposition of Law VI:* The trial court erred by denying appellant's request for a jury instruction on the defense of self-defense, thereby denying appellant his right to due process of law and against cruel and unusual punishment as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 5, 9, and 16 of the Ohio Constitution.

*"Proposition of Law VII:* The trial court committed plain error by giving an erroneous and misleading jury instruction on the culpable mental state [of]

55

purposely and thereby deprived appellant of his right to due process of law and against cruel and unusual punishment.

"*Proposition of Law VIII:* The trial court erred by failing to give a limiting instruction on 'other acts,' thereby depriving appellant of his constitutional right to due process and against cruel and unusual punishment, as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 5, 9, 10, and 16 of the Ohio Constitution.

"*Proposition of Law IX:* The trial court erred by allowing the admission of a handgun which was not properly authenticated and was irrelevant, confusing and misleading, in derogation of the appellant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16[,] Article I, and Section 26, Article II of the Ohio Constitution.

"*Proposition of Law X:* The trial court erred by allowing the admission of the unsworn testimony of a witness and thereby violating appellant's constitutional right to due process of law, as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 5, 9, 10, and 16 of the Ohio Constitution.

"*Proposition of Law XI:* The prosecutor's misconduct during voir dire denied appellant his due process right to a fair trial.

"*Proposition of Law XII:* Prosecutorial misconduct during the trial phase deprived appellant of his right to due process of law and against cruel and unusual punishment.

"*Proposition of Law No. XIII:* There is constitutionally insufficient evidence to sustain appellant's convictions for four counts of aggravated murder and two counts of robbery.

"*Proposition of Law XIV:* The trial court erred and deprived appellant of his constitutional right to due process of law and against cruel and unusual punishment by failing to order the election of counts prior to the sentencing phase of appellant's trial.

"*Proposition of Law XV:* The trial court erred by excluding relevant mitigation evidence at the penalty phase of Mr. Palmer's capital trial, in violation of his rights to an informed, individualized determination of the appropriate penalty and to his constitutional rights to due process and against cruel and unusual punishment.

"*Proposition of Law XVI:* Prosecutorial misconduct during the penalty phase of appellant's trial deprived appellant of his right to due process of law and against cruel and unusual punishment.

"*Proposition of Law XVII:* Prosecutorial misconduct during the penalty phase of appellant's trial by the prosecutor[']s reference to the Bible in urging the jury to sentence appellant to death deprived appellant of his right to due process of law and against cruel and unusual punishment.

"*Proposition of Law XVIII:* The trial court's sentencing phase instruction which required the jury to be unanimous in their decision that the defendant was to receive a life sentence violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 5, 9, 10, and 16 of the Ohio Constitution.

"*Proposition of Law XIX:* The trial court erred by allowing the jury to consider multiple specifications which arose from an indivisible course of conduct, thereby depriving appellant of his right to due process of law and against cruel and unusual punishment, as guaranteed by the Fifth, Eighth, and Fourteenth

57

Amendments to the United States Constitution and Article I, §§ 5, 9, 10, and 16 of the Ohio Constitution.

*"Proposition of Law XX:* The trial court erred by failing to instruct the jury during the penalty phase that they were required to consider each count of aggravated murder separately and that only the aggravating circumstances proven in the individual counts should be weighed against the mitigating circumstances, thereby denying Donald Palmer his constitutional right to a reliable sentencing determination.

*"Proposition of Law XXI:* The ineffective assistance of counsel provided by trial counsel violated appellant's rights, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I §§ 5, 9, 10 and 16 of the Ohio Constitution.

*"Proposition of Law XXII:* The independent weighing process conducted by the trial court pursuant to R.C. §§ 2929.03(D)(3) and (F) was faulty and resulted in a death verdict which was contrary to the weight of the evidence and in violation of appellant's right against cruel and unusual punishment.

*"Proposition of Law XXIII:* The proportionality review that this court must conduct in the present capital case pursuant to Ohio Revised Code § 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant to the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, Sections 5 and 10, Article I, of the Ohio Constitution and R.C. § 2929.05.

*"Proposition of Law XXIV:* The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio's statutory provisions governing the imposition of the death penalty, contained in Revised Code 2903.01, 2929.02, 2929.021, 2929.022,

58

2929.023, 2929.03, 2929.04 and 2929.05, do not meet the prescribed requirements and thus are unconstitutional, both on their face and as applied.

"*Proposition of Law XXV:* Appellant was denied a fair trial by the cumulative effect of the errors occurring at trial, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections [*sic*] of the Ohio Constitution."