OPINION
Defendant-Appellant Derrick Vinzant was convicted by a jury of one count of voluntary manslaughter of Todd Ivory, one count of aggravated assault of Eric Bailey, and one count of having weapon under disability, as well as a firearm specification. Derrick's father, Douglas Vinzant, was concurrently tried for aggravated assault, but was acquitted. Derrick was sentenced consecutively for his offenses for a total of twelve years. He now appeals his conviction raising the following assignments of error:
 The trial court committed prejudicial error when it failed to comply with the Ohio Rules of Criminal Procedure Rule 43.
 The trial court erred to the prejudice of Mr. Vinzant when it failed to allow jurors to be voir dired individually regarding the effect of actions taken by the prosecution and the reactions of the gallery.
The defendant was denied the effective assistance of counsel.
 The verdict of the jury was against he manifest weight of the evidence.
 I
In his first assignment of error, Derrick alleges that the trial court erred in failing to ensure his presence at every stage of the trial pursuant to Crim.R. 43(A). Specifically, Derrick points out three instances where he was prejudicially absent. First, when the court and counsel discussed problems with two jurors; second, when court and counsel discussed and agreed on stipulations regarding a serology report; and third, following voir dire when cause and peremptory challenges were made. All three of these incidents occurred in chambers.
Crim.R. 43(A) provides:
 The defendant shall be present at the arraignment and every stage of the trial, including the empaneling of the jury, the return of the verdict, and the imposition of sentence, except as otherwise provided by these rules. In all prosecutions, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the verdict.
Under the terms of this rule, defendant's presence is not required if his absence is voluntary. Because defense counsel may act on behalf of his client, an express waiver of defendant's presence by defense counsel is sufficient to waive the Crim.R. 43 requirement. State v. Carr (1995),104 Ohio App.3d 699, 703. Although there was no express waiver, nor any inquiry by the court regarding defendant's absence in this case, the defense counsel failed to object to defendant's absence at any of the three events described above. Failure to object results in a waiver of any error resulting from defendant's absence. Carr, supra. Therefore, we may only address this assignment under a plain error analysis.
"Plain error does not exist unless it can be said that, but for the error, the outcome of the trial clearly would have been otherwise." Id., citing State v. Long (1978), 53 Ohio St.2d 91, 97. We cannot say that the defendant's presence at any of the three events challenged would have changed the outcome of the trial.
First, Derrick challenges his absence when the court spoke to two jurors regarding problems, and when the court discussed these problems with counsel. In order for communication between court and jury outside the presence of the parties to warrant reversal, the communication must be substantive in nature and prejudicial to the party complaining. Statev. Schiebel (1990), 55 Ohio St.3d 71, 84.
Two separate jurors approached the court with different issues potentially affecting their ability to remain on the jury. Juror Peters approached the court at the end of the second day and expressed concern that her aunt was friends with the defendant's mother, and that may compromise her ability to remain impartial. This discussion with the court was on the record, but filed under seal. The next morning, Juror Peters again discussed her situation with the court, but conveyed that she could remain on the jury and render a fair verdict.
In addition, Juror Beuhler phoned the court the morning of the third day and expressed concern that she could not judge people and therefore, should not remain on the jury. Only after much coaxing from Judge Froehlich, Juror Beuhler actually did report that day, but did not enter the jury room. She discussed her situation in chambers with Judge Froehlich where she was very upset, and adamantly denied her ability to remain on the jury because she could not judge people. Moreover, she felt sorry for everyone, victims and defendants. Juror Beuhler was taken to a separate room from the other jurors, and Judge Froehlich called all counsel into chambers to discuss both juror issues.
During this discussion, the court expressed its opinion that Juror Peters could remain, but Juror Beuhler should likely be dismissed. The court then welcomed comments or objections from counsel. Initially, defense counsel had no objections to the suggested solution, but asked to discuss it with his client. The court agreed for defense counsel to discuss Juror Beuhler's dismissal with their clients, but asked that they not mention the situation with Juror Peters until the state had decided whether it was going to object to her remaining on the jury. The court explained its concern that if the defendants knew of the Juror Peters' situation, it may be exacerbated unintentionally by eye contact, or obvious attempts not to make eye contact, or something of that nature.
When the court and counsel went back on the record, the state objected to Juror Peters remaining on the jury, and defense counsel objected to Juror Beuhler being dismissed. Further, defense counsel requested, and was allowed to hear, the verbatim discussion that occurred in chambers between the court and Juror Beuhler. The trial court heard objections from counsel, but decided to dismiss Juror Beuhler and retain Juror Peters.
After considering this chain of events, we do not see how Derrick was prejudiced by his absence in chambers for any of the discussions regarding the jurors. The court relayed to counsel all discussions it conducted in chambers with each juror, and even had the court reporter read one discussion verbatim. The court then allowed counsel to discuss the situation with their clients prior to making its determination. Although the court did request that counsel not discuss the Juror Peters issue with their clients, this court fails to see how Derrick could have been prejudiced by having a juror friendly to his family remain on the jury. In fact, defense counsel zealously argued against dismissing Juror Peters. Moreover, based on the discussion between the court and Juror Beuhler, which was read to all counsel, we find that the trial court had no choice but to dismiss her from service. In any event, Derrick has not demonstrated that his absence during these discussions in any way affected the outcome of the trial.
Next, Derrick challenges his absence during a discussion in chambers between court and counsel regarding stipulations to certain exhibits. Specifically, counsel all agreed to stipulate to the serology reports of Mark Squibb of the Miami Valley Regional Crime Lab. After reviewing these reports, we find that the crime lab analyzed blood samples from different locations throughout the crime scene and identified whether it was consistent with blood samples from Todd Ivory or Derrick Vinzant. Although we agree with Derrick that these reports establish somewhat of a blood trail at the scene, we do not see any material prejudice arising from Derrick's absence during the stipulation to the reports.
The reports indicate that certain samples of blood are "consistent with" or "mixtures where the major contributor of the profiles is consistent with" Todd Ivory. They then list a group of samples for which both Todd and Derrick could be eliminated as contributors. These reports, although not conclusive, establish where Todd's blood was found, and where someone else's, potentially Eric's, blood was found at the scene. We see no reason how requiring Mark Squibb to testify regarding these reports could have been beneficial to Derrick's case. This is especially true since Derrick indicated on the stand that he was unsure of Todd and Eric's exact locations when they received their injuries.[1] In any event, Derrick has not demonstrated that his absence during the stipulation affected the outcome of the trial.
Finally, Derrick argues that Crim.R. 43 certainly required his presence during an in-chambers discussion regarding challenges to prospective jurors. Unfortunately, the record does not clearly demonstrate that Derrick was not present for this discussion. In the absence of evidence to the contrary, regularity in the proceedings is presumed. State v.Lewis (Apr. 28, 1994), Franklin App. No. 93AP-911, unreported, at p. 6. Because the record does not clearly reflect exactly who was present in chambers for this discussion, we cannot find that the outcome of the trial was affected.
Based on the foregoing, Derrick's first assignment of error is overruled.
 II
The second assignment of error involves an issue mentioned above in the first assignment. Derrick claims that the trial court erred in not allowing defense counsel to voir dire the remaining jurors after Juror Beuhler was dismissed, and furthermore in failing to specifically rule on the request.
During Juror Beuhler's in-chambers discussion with the court, she specifically mentioned as partial basis for her state of mind the victim's mother crying in the gallery when coroner's slides of her son's body were shown. Evidently, Mrs. Ivory began crying and exited the courtroom while the slides were being shown at trial. However, this incident is not mentioned in the record. While this episode seemingly had an effect on Juror Beuhler, there was no indication that it had any effect on the other jurors. In addition, after leaving the courthouse following the second day of trial, Juror Beuhler had no further contact with the other jurors.
Failure to rule on a motion is generally treated as though the motion were overruled. State ex rel. Cassels v. Dayton City School Dist. Bd. ofEdn. (1994), 69 Ohio St.3d 217, 223. Consequently, our only concern is whether the trial court erred in overruling Derrick's motion to voir dire the remaining jurors. We find no error in that decision.
While the court did not expressly state why it denied voir dire of the other jurors, the state argued that doing so would highlight the situation when the other jurors had not voiced any concerns with emotional expression in the courtroom. Furthermore, emotional outpouring by family members should be expected in any case which involves someone's death. Without any indication that the jury's ability to remain fair and impartial has been affected, we find that an individual voir dire of the remaining jurors was unnecessary. Accordingly, the trial court did not err in impliedly overruling the defense motion, and Derrick's second assignment of error is overruled.
 III
In his third assignment of error, Derrick alleges that his trial counsel provided ineffective assistance. When a defendant raises a claim of ineffective assistance of counsel, we must determine first whether counsel has violated any essential duties to his client, and second, whether the defendant was prejudiced by counsel's ineffectiveness. Statev. Bradley (1989), 42 Ohio St.3d 136, 141-42. See, also, Strickland v.Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052. When determining the ineffectiveness of counsel's performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 142, citing Strickland, supra, at 688. However, courts must begin with a strong presumption that counsel's performance was professionally reasonable. Id. Even if counsel commits a professionally unreasonable error, the judgment will not be set aside unless the error had an effect on the outcome of the trial. Id.
Derrick alleges three specific incidents of ineffective assistance of counsel. First, he argues that trial counsel's performance fell below an objective standard of reasonableness when he failed to impeach various witnesses with their videotaped statements. When defense counsel began cross examination of state's witness, Michael Jackson, defense counsel asked him immediately if he gave a videotaped statement to police soon after the shootings. At that point, defense counsel attempted to have the videotape played for the jury. The state's objection to playing the tape at that point was sustained as no foundation had been laid for its admission. During a side bar, defense counsel argued such theories as past recollection recorded and refreshing recollection, while the trial court suggested an appropriate means to introduce the tape would be prior inconsistent statement, but only if a proper foundation was laid. Through further examination, defense counsel then attempted to point out inconsistencies between Jackson's testimony and his videotaped statement, but never again attempted to introduce the tape for impeachment or any other purpose.
Derrick alleges that failure to impeach Michael Jackson with his videotape changed the outcome of his trial. However, the videotape was never even proffered into evidence, so we have no evidence that the videotape contained any statements inconsistent with how Jackson testified at trial. As a result, we cannot say that defense counsel's failure to use the videotape for impeachment prejudiced Derrick in any way.
Second, Derrick challenges trial counsel's failure to poll the jury after the verdict. Because of the earlier problems with the two jurors and the emotional "outbursts" of family members during the trial, Derrick argues that failure to request a jury poll was unreasonable and prejudicial. On the contrary, Derrick has not demonstrated any prejudice resulting from defense counsel's failure to poll the jury. Cf. State v.Hike (May 21, 1998), Franklin App. No. 97APA04-554, unreported, at p. 8.
Finally, Derrick claims that defense counsel failed to adequately argue self defense to the jury during closing argument. Although defense counsel did not specifically mention self defense or its elements, he made several comments which suggested Derrick's actions constituted self defense. In this regard, defense counsel stated:
 So this encounter with the fists on the sidewalk that escalated into a struggle where my client becomes dazed and his one good eye puffy, he's blind in his other eye, makes him fear for his life.
* * *
 [After a description of Todd Ivory yelling for the gun], [o]n the bottom of the football pile-up after you have gone through the struggle and the encounter and the beating that you have, do you think it's reasonable that Mr. Vinzant has to say, "Hmm, who is he calling to and does that person actually have the ability to give Todd Ivory a gun?" No. The law doesn't require that.
* * *
So as a last resort, Mr. Vinzant goes to the side of his van.
 * * * He takes the gun out and, ladies and gentlemen, this is his last resort because you know if he wanted to use that gun that night when he first encountered those two at the front of the van — he was closer to the van and more conscious at that point — if he knew there was a gun there and if it was his intent to do harm to Todd and to Eric Bailey, he could have simply taken that gun * * *.
 * * * It was his last resort because he feared for his life because this struggle had so escalated.
 What did he do? He used deadly force. Reasonable under the circumstances.
This argument by counsel, accompanied by the court's extensive instructions on self defense, were sufficient for the jury to adequately consider Derrick's affirmative defense. We do not find any prejudicial error in defense counsel's closing argument. Based on the foregoing, Derrick's third assignment of error is overruled.
 IV
In his final assignment of error, Derrick argues that his convictions were against the manifest weight of the evidence. When reviewing a manifest weight claim, the appellate court "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387. A verdict should only be overturned in extraordinary situations when evidence weighs heavily against the conviction. Id. However, we will not disturb the jury's determination of witness credibility and conflicting testimony unless "it is so incredible that it defies belief." Fairbornv. Boles (May 15, 1998), Greene App. No. 97-CA-110, unreported, at p. 3.
Before unraveling the events of July 20, 1999, there are a few players that need to be identified and some history explained. Derrick Vinzant has a sister named Donelle. Donelle, some time prior to July 20, had a relationship with Eric Bailey. A few weeks prior to the incident involved in this case, Donelle, Derrick, Eric and two other individuals all came to be at White Allen Chevrolet at the same time. Although complete details of how the altercation started are vague, it appears that Derrick required treatment at the hospital at the hands of Eric Bailey and his companion.
On the evening of July 20, 1999, Derrick was preparing for a trip to Las Vegas the following day. He had run some errands and stopped by his family's business, BD Entertainment at 2228 Germantown. Several family members were present, some of whom testified to the joyful mood Derrick was in that evening. Derrick left BD to finish his errands at approximately 7:30 P.M.
Several witnesses testified as to the events of July 20, 1999, and predictably, several different versions were told. It is agreed that Derrick was walking down Germantown toward his van when Eric Bailey and Todd Ivory drove by in a car. They then made a u-turn and pulled quickly into a parking spot in front of Derrick's van. Eric claimed they were parking to visit the Hair Kapitol Barber Shop at 2240 Germantown. When Todd and Eric exited the car, a confrontation occurred between Eric and Derrick. Eric testified that the first physical contact was Derrick pushing him; Derrick claimed that Eric punched him and then Todd pushed him from behind. Derrick testified he was trapped between their car, Eric, his van, and Todd.
A few minutes after Derrick left the store, Alvina Candler ran into BD and exclaimed that there was a fight occurring down the road in front of a church where two men were beating up another man. As a result of this notice, someone from the family looked outside and realized it was Derrick receiving the beating. Douglas Vinzant, Derrick's father, left BD with a metal pipe he used to protect his business. In addition, Donelle testified that she and her sister also ran down to where the fight was taking place.
All of the witnesses except Eric testified that the fight eventually traveled to the grassy area in front of the church, up against a fence where Derrick was curled up in a ball, and Eric and Todd were beating and kicking him. While this was happening, Douglas arrived, asking what was going on. No one responded, and Derrick appeared to be unconscious. According to Douglas' testimony, as soon as he arrived on the scene, Eric walked away. Todd, however, lunged at him, and Douglas hit him with the metal pipe, cutting open his forehead. At that point, Douglas was knocked down from behind and several people began struggling for the pipe, which Douglas never relinquished.
When this pile broke up, Todd went to Hair Kapitol, which was right next door to the church, and Derrick headed toward his van. Todd banged on the door of the barber shop frantically yelling for someone to give him a gun. The barber, Keith Sellers, and a customer, Michael Jackson, were inside with two children. In response to this pounding and yelling, Sellers answered the door, but informed Todd he did not have a gun.
As Todd left the porch of the Hair Kapitol, the stories completely diverge. Two witnesses for the state, Eric Bailey, and Thomas Daniels, a neighbor, testified that as Todd left the barber shop, Eric was already on the driver's side of the Pontiac. Donelle, who testified for the state, claimed Eric was on the passenger side of the car. Another witness for the state and both Derrick and Douglas testified that when the first shots were fired, Eric was still at the rear of the Pontiac or on the sidewalk, wrestling over the pipe with Douglas.
Next, all of the witnesses except Derrick and Douglas testified that when Todd left the porch of the Hair Kapitol he headed toward the Pontiac. Some said he headed toward the passenger side, some said the driver's side. Douglas testified he did not pay attention to Todd because he and Eric were still wrestling over the pipe. Derrick claimed instead that Todd raced toward where he was standing next to his van, which was parked behind the Pontiac. It is interesting to note that Derrick only has vision in one eye, the eye that was injured during the encounter with Todd and Eric.
Most witnesses testified that they first heard shots fired when Todd was on the sidewalk in front of the Hair Kapitol. Todd then ran around the Pontiac to the driver's side and Derrick continued to shoot. Some witnesses testified that Derrick actually chased him around the Pontiac firing the gun. The testimony never clearly established at what point Todd received his two bullet wounds. However, it was clear that he collapsed in the street on the driver's side of the Pontiac.
Similarly, the evidence was vague concerning when and where Eric received his gunshot wound. Eric and Thomas Daniels both testified that Eric was shot on the driver's side of the Pontiac and then Douglas beat him with the metal pipe until he could break free and run into the Zion Lion. Michael Jackson testified Eric was shot while standing by the Pontiac and then ran to the Zion Lion. Donelle and Derrick both testified that Derrick shot Eric as he ran toward the Zion Lion.
Derrick's version of the shootings was as follows: While he was still in the pile-up at the fence, Derrick heard Todd ask someone for a gun. He managed to get up and run to the van, hoping, but not certain, there was a gun inside. The van actually belonged to a friend who sometimes kept a gun in a black bag inside the vehicle. Derrick opened the sliding door and reached into the bag, finding the gun. He then saw Todd racing toward him, yelling "I'm going to fuck these mother-fuckers up." Derrick pulled the gun out of the bag and fired.
Immediately thereafter, Derrick walked around the car to find Todd lying on the ground, and he asked him several times to get up. At that point, the gun went off again, but Derrick claims the bullet did not hit Todd. Derrick then looked up and saw Eric and his dad still wrestling over the pipe. He pointed the gun at Eric, and told him to stop and lie down until the police arrived. Instead, Eric took off running toward the Zion Lion. Derrick pointed the gun at him and pulled the trigger. He testified that he had been inside all of the businesses in that section of Germantown, and knew that just about all of them kept guns inside for protection.
Derrick argues that the elements of self defense were met, and for that reason, the jury's verdict finding him guilty of voluntary manslaughter was against the manifest weight of the evidence. The following elements must be satisfied to establish self defense:
 (1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger.
State v. Palmer (1997), 80 Ohio St.3d 543, 563. The only exception the law provides for the duty to retreat before using deadly force is if an individual is in his home at the time of the confrontation. That situation does not apply in our case. Therefore, if the defendant was at fault in creating the situation, if he did not have a bona fide belief he was in imminent danger of great bodily harm, or if he had a means of escape aside from the use of deadly force, then the defendant had a duty to retreat.
In the present case, the evidence demonstrated that Derrick did not cause the confrontation between he and Eric and Todd on July 20, 1999. We also believe Derrick had a bona fide belief that he was in imminent danger of bodily harm while Eric and Todd were beating him. However, the majority of the evidence indicated that Derrick was not in imminent danger at the time he began firing the gun, because the individuals had dispersed. Although Derrick testified that Todd exited the barber shop and ran directly at him, all other testimony indicated Todd headed straight for the Pontiac when he left the barber shop. In any event, Derrick had ample time to escape when he ran to his van. Instead of escaping, he searched for the gun and began firing.
Based on the foregoing, we find that the jury did not lose its way in finding Derrick guilty of the crimes charged. Accordingly, Derrick's fourth assignment of error is overruled.
Judgment affirmed.
GRADY, J., and YOUNG, J., concur.
[1] In fact, further probing would point out that blood which could have been Eric's was found on the driver's side and rear of the car, which is inconsistent with Derrick's testimony that he only fired at Eric when he began running toward the Zion Lion.