[Cite as *State v. D'Andrea*, 2026-Ohio-2247.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

GUY ALAN D'ANDREA,

    DEFENDANT-APPELLANT.

CASE NO. 15-25-10

OPINION AND
JUDGMENT ENTRY

---

Appeal from Van Wert County Common Pleas Court
Trial Court No. CR-24-11-144

Judgment Affirmed

Date of Decision: June 15, 2026

---

APPEARANCES:

    *Kenneth J. Rexford* for Appellant

    *Morgan A. Jackson* for Appellee

**WALDICK, J.**

{¶1} Defendant-appellant, Guy A. D'Andrea ("D'Andrea"), brings this appeal from the November 24, 2025 judgment of the Van Wert County Common Pleas Court sentencing him to prison after D'Andrea was convicted by a jury of Endangering Children in violation of R.C. 2919.22(B)(1), a second degree felony. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} On November 7, 2024, D'Andrea was indicted for Endangering Children in violation of R.C. 2919.22(B)(1), a second degree felony, and Endangering Children in violation of R.C. 2919.22(B)(3), a second degree felony. It was alleged that D'Andrea kicked the groin-area of his 11-year-old foster-child, N.K., causing serious physical harm. D'Andrea pled not guilty to the charges.

{¶3} D'Andrea proceeded to a jury trial, which was held October 20-23, 2025. The jury determined that D'Andrea was guilty of Endangering Children in violation of R.C. 2919.22(B)(1), but not guilty of the alternative allegation of Endangering Children in violation of R.C. 2919.22(B)(3). On November 24, 2025, D'Andrea was sentenced to serve an indefinite prison term of four to six years. D'Andrea now brings the instant appeal, asserting the following assignments of error for our review.

**First Assignment of Error**

**The failure of the Trial Court to properly and adequately record all of the proceedings at trial violated Mr. D'Andrea's right to due process, assured to him by the Ohio Constitution and the United States Constitution.**

**Second Assignment of Error**

**The Trial Court erred by allowing N.K. to testify.**

**Third Assignment of Error**

**The Trial Court erred in finding Mr. D'Andrea guilty because the conviction was against the manifest weight of the evidence.**

{¶4} For ease of discussion, we elect to address the assignments of error out of the order in which they were raised.

*Second Assignment of Error*

{¶5} In his second assignment of error, D'Andrea argues that the trial court erred by determining that N.K. was competent to testify.

Standard of Review

{¶6} A trial court's determination of whether a child is competent to testify is reviewed under an abuse of discretion standard. *See State v. Spencer*, 2025-Ohio-3268, ¶ 16 (7th Dist.); *State v. Maxwell*, 2014-Ohio-1019, ¶ 100 (addressing a prior version of Evid.R. 601). A trial court abuses its discretion when its determination is

arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

## Relevant Authority

**{¶7}** Evidence Rule 601(A) states that "Every person is competent to be a witness except as otherwise provided in these rules."[1] Evidence Rule 601(B) then provides guidelines for the disqualification of witnesses. It reads, in pertinent part,

> A person is disqualified to testify as a witness when the court determines that the person is any of the following:
>
> (1) Incapable of expressing himself or herself concerning the matter as to be understood, either directly or through interpretation by one who can understand him or her;
>
> (2) Incapable of understanding the duty of a witness to tell the truth[.]

**{¶8}** Further guidance regarding the competency of witnesses is provided in R.C. 2317.01, which reads, "All persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Notably, competency of a child to testify is determined

---

[1] A prior version of Evidence Rule 601 indicated that "children under ten years of age, who appear incapable of receiving just impression of the facts and transactions respecting which they are examined, or of relating them truly" were not competent to testify. The age cutoff has been removed from Evid.R. 601(A), but not from R.C. 2317.01.

as of the time of trial, not at the time the crime allegedly occurred. *State v. Clark*, 1994-Ohio-43.

{¶9} In making a competency determination, the Supreme Court of Ohio has directed trial courts to consider the following factors, particularly when evaluating a child *under* ten years of age: (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify; (2) the child's ability to recollect those impressions or observations; (3) the child's ability to communicate what was observed; (4) the child's understanding of truth and falsity; and (5) the child's appreciation of his or her responsibility to be truthful. *State v. Frazier*, 61 Ohio St.3d 247, 251 (1991).

Analysis

{¶10} N.K., the victim in this matter, was born in December of 2012. N.K. is autistic and has cerebral palsy. N.K. alleged that she was injured by D'Andrea in early August of 2024, making her 11 years old at the time of the incident.

{¶11} On February 21, 2025, D'Andrea filed a motion to determine N.K.'s competency as a witness. Under Evid.R. 601 and R.C. 2317.01, when an issue arises as to the competency of a child to testify, "the responsibility of the trial judge is to determine through questioning whether the child of tender years is capable of receiving just impressions of facts and events and to accurately relate them." *State v. Frazier*, 61 Ohio St.3d 247, 251 (1991). Importantly, under the legal authority

cited herein, we must "start with the presumption that all persons are competent to testify, even children[,]" particularly if the child is over 10 years old. *State v. Spencer*, 2025-Ohio-3268, ¶ 17 (7th Dist.).

{¶12} A hearing on N.K.'s competency as a witness was held on April 10, 2025. The trial court addressed N.K. directly and asked her a series of questions. N.K. provided her first and last name and testified that she was 12 years old, but she initially provided her birth year as 2002 instead of 2012. The trial judge spoke with N.K. further on the matter but N.K. struggled with the math.

{¶13} When asked, N.K. provided the school she attended, the grade she was in, her teachers, and her favorite activity. N.K. indicated she had four sisters, though she only regularly saw one of the sisters. N.K. also knew the name of the person her sister was placed with.

{¶14} N.K. was asked if she knew what it meant to tell the truth and she said it was the "opposite of lying." The trial court provided an example, asking if it would be a lie if he said there were twenty people sitting in the audience. N.K. indicated it would be a lie because there were not twenty people in the audience.

{¶15} Nevertheless, N.K. did express some uncertainty regarding the difference between the truth and a lie, so the trial court continued to question her. N.K. indicated that it was good to tell the truth and she was going to tell the truth because if she did not she would get in "big trouble."

{¶16} The trial court then further inquired into N.K.'s memory, asking her about summer activities. N.K. indicated she enjoyed swimming at a "splash pad," and she named some of her friends from summer camp. After some further discussion, the hearing concluded.

{¶17} On April 11, 2025, the trial court issued a written decision finding N.K. competent to testify in this case. N.K. did, in fact, testify at trial against D'Andrea.

{¶18} D'Andrea argues that the trial court abused its discretion by determining that N.K. was competent to testify. He argues that N.K. was known to be autistic, prone to self-harm, and confused about her own birth date. He argues that N.K. did not adequately demonstrate she understood the difference between the truth and a lie and that her responses at times were "bizarre."

{¶19} At the outset of our analysis, we emphasize that we begin with the presumption that N.K. who was 12 years old at the time of her competency hearing, was competent to testify under both Evid.R. 601 and R.C. 2317.01. *Spencer*, *supra* at ¶ 17. Further, D'Andrea has provided us with no case authority wherein a similarly-aged child providing analogous responses was determined to be incompetent to testify.

{¶20} Regardless, N.K. demonstrated to the trial court that she could receive "impressions of fact" when she detailed her schooling and her favorite activities. In fact, N.K. actually corrected the trial court at one point, indicating that she was

swimming in a "splash pad" rather than a pond or pool. N.K. was also able to name her friends from the prior summer and recognize that she had been at a summer camp for over a month in the prior year, which was when the offense allegedly occurred.

{¶21} N.K. did express some confusion when asked about truth and falsity. She initially indicated that the truth was the opposite of a lie, but she had trouble expanding on that point. However, she did understand that the trial court would be lying if it said there were twenty people in the room when there were not actually twenty people in the room. In addition, N.K. indicated she understood the important of telling the truth, which would "set her free."

{¶22} After analyzing N.K.'s dialogue with the trial court in its entirety, we do not find that the trial court abused its discretion by determining that N.K. was competent to testify. The vast majority of D'Andrea's issues with N.K.'s competence were credibility issues that could be explored on cross-examination, not issues with N.K.'s overall competence to testify. For all these reasons, we do not find that the trial court's decision was arbitrary, unreasonable or unconscionable. Therefore, D'Andrea's second assignment of error is overruled.

*First Assignment of Error*

{¶23} In his first assignment of error, D'Andrea argues that the trial court violated his right to due process by failing to adequately record all of the

proceedings at trial. Specifically, he contends that N.K.'s testimony was not properly recorded.

Relevant Authority

{¶24} Criminal Rule 22 governs the recording of proceedings and reads, in pertinent part,

> In serious offense cases all proceedings shall be recorded.[2]
>
> . . .
>
> Proceedings may be recorded in shorthand, or stenotype, or by any other adequate mechanical, electronic or video recording device.

{¶25} "[A] court's failure to comply with Crim.R. 22 is not inherently prejudicial given the alternative to a transcript available under App.R. 9." *State v. McClusky*, 2004-Ohio-85, ¶ 16 (6th Dist.). In criminal cases, a court will not reverse the conviction of a defendant due to unrecorded proceedings, unless "(1) a request was made at trial that the conferences be recorded or that objections were made to the failures to record, (2) an effort was made on appeal to comply with App.R. 9 and to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted from the failure to record the proceedings at issue." *State v. Palmer*, 80 Ohio St. 3d 543, 554, 1997-Ohio 312.

---

[2] A "serious offense" includes any felony, which encompasses the offenses herein.

Analysis

{¶26} Without objection by the defense at trial, N.K. testified from the basement of the courthouse using "Webex-enabled remote testimony." More specifically, N.K. was in the juvenile court courtroom along with the trial judge, the court reporter, and counsel. N.K.'s testimony was projected into the primary courtroom. N.K. provided approximately 43 pages of testimony in the transcript, the majority of which was on cross-examination.

{¶27} D'Andrea argues that N.K.'s testimony was not properly recorded and the electronic recording used was not adequate. We disagree.

{¶28} During her testimony, which included direct-examination, cross-examination, and a brief re-direct examination, N.K. was asked nearly 300 questions. A review of the transcript shows that there are fewer than 10 instances where N.K.'s responses were entirely inaudible. There are approximately a dozen more instances where there were partial inaudible answers. The vast majority of any claimed "recording errors" come from instances where the transcript indicates that there was "no audible response" from N.K. There were over 40 instances of "no audible response" in the transcript. However, of those 40 instances of "no audible response," many of the next questions asked of N.K. implied that N.K. had responded to the question, likely by shaking her head yes or no, albeit not recognized

in the transcript. The following two excerpts from cross-examination illustrate this point.

> [DEFENSE COUNSEL]: Do you remember telling her that you had hit yourself with a hard plastic thing?
>
> [N.K.]: (No audible answer)
>
> [DEFENSE COUNSEL]: Okay. Can you tell me what the hard plastic thing was that you hit yourself with?
>
> [N.K.]: I don't remember.

(Tr. at 498).

> [DEFENSE COUNSEL]: . . . You've talked to us a little bit about before when you would get upset that you would sometimes hurt yourself, right?
>
> [N.K.]: (No audible answer)
>
> [DEFENSE COUNSEL]: Okay. You've hit yourself in the face before.
>
> [N.K.]: Yea.
>
> [DEFENSE COUNSEL]: When you were upset right? Sometimes you'd hit yourself on the butt, right?
>
> [N.K.]: (No audible answer)
>
> [DEFENSE COUNSEL]: Okay. And you've scratched your own neck before, right?
>
> [N.K.]: (No audible answer)
>
> [DEFENSE COUNSEL]: Okay. And you've hit your legs before as well, right?

[N.K.]: (No audible answer).

(Tr. at 495). Notably, both of these excerpts involve defense counsel questioning N.K. and defense counsel does not indicate that for the record it should be noted N.K. was nodding or shaking her head.

{¶29} A review of the transcript establishes that well over two-thirds of N.K.'s testimony was properly transcribed, and well over half of her uncaptured responses can be gleaned from context of the questions asked.

{¶30} Notwithstanding these points, it is D'Andrea's burden to demonstrate that he was prejudiced by any failure of the recording, and he does not, and cannot do so based on the record before us. In fact, the transcript reflects clear testimony during the most critical parts of direct and cross-examination.

{¶31} On direct-examination N.K. clearly testified that D'Andrea kicked her in her "privates"/between her legs. Then, at the conclusion of cross-examination, the following exchange occurred:

> [DEFENSE COUNSEL]: [T]he truth is you hurt yourself that day when you were upset, right?
>
> [N.K.]: Yeah.
>
> [DEFENSE COUNSEL]: Okay. Nobody kicked you did they?
>
> [N.K.]: No.

(Tr. at 514). Defense counsel thus clearly got N.K. to state that she had actually hurt herself. Notably, N.K. was rehabilitated on re-direct when she was asked how her legs were hurt and she testified that D'Andrea kicked her.

{¶32} Applying the *Palmer* factors to this case, defense counsel did not indicate to the trial court that the "no audible response" answers should be recorded. *State v. Palmer*, 80 Ohio St. 3d 543, 554, 1997-Ohio 312. The State also asserts that D'Andrea did not fulfill his obligations under App.R. 9 to reconstruct what occurred *or* establish its importance, and we agree, particularly with the latter point. D'Andrea has not established the importance of any of the specific inaudible portions of the transcript or how he was prejudiced by any failure to capture what was said (or gestured). Furthermore, D'Andrea has not demonstrated any prejudice as he was able to thoroughly challenge N.K.'s credibility and her version of events. For all of these reasons, D'Andrea's first assignment of error is overruled.

*Third Assignment of Error*

{¶33} In his third assignment of error, D'Andrea argues that his conviction was against the manifest weight of the evidence.

Standard of Review

{¶34} In determining whether a conviction is against the manifest weight of the evidence, we must examine the entire record, weigh the evidence and all

reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When applying the manifest weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

Controlling Statute

{¶35} D'Andrea was convicted of Endangering Children in violation of R.C. 2919.22(B)(1)/(E)(1)(d), which reads:

> No person shall do any of the following to a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age:
>
> (1) Abuse the child[.]
>
> . . .
>
> (E)(1) Whoever violates this section is guilty of endangering children.
>
> . . .
>
> (d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree.

Evidence Presented

**{¶36}** In November of 2023, N.K. and her younger sister were placed in foster care with D'Andrea and D'Andrea's wife, Victoria. The D'Andreas had a child of their own and multiple adopted children.

**{¶37}** In January of 2024, N.K. was diagnosed with autism. In addition, the D'Andreas reported that N.K. would engage in self-harming behavior when she had "really big emotions." The D'Andreas recorded N.K. on multiple occasions slapping herself in the face with one or both hands because she had "been bad." During one of the videos N.K. stated that she was going to get D'Andrea "in trouble with [someone named] 'Jessica.'"

**{¶38}** After witnessing N.K.'s self-harming behavior, the D'Andreas contacted the "Marsh Foundation," which was involved in placing the foster children, to seek a safety plan for N.K. According to Victoria D'Andrea, the Marsh Foundation told them to do whatever was best for N.K. With little direction provided regarding N.K.'s self-harming behavior, Victoria indicated that she and D'Andrea decided they would have a policy of not being alone with N.K. when she was upset, and that they would stand six feet away from her. Victoria indicated that D'Andrea was not to be alone with N.K. at all.

**{¶39}** On Sunday, August 4, 2024, the D'Andreas discovered that there was an issue with their window air-conditioning unit. On the back of the unit, "the fins

were all bent in." D'Andrea noticed the issue and surmised that one of the children was "messing" with the unit so he was going to talk to the children. N.K. initially denied damaging the unit, but another one of the children indicated that he saw N.K. mess with the unit.

{¶40} N.K. eventually admitted that she had damaged the air-conditioner. Afterward, N.K. was outside in the yard with D'Andrea and another one of the children. N.K. indicated that when she was in trouble D'Andrea would make her run. At some point, the child that was outside with D'Andrea and N.K. was no longer with them. The evidence indicated that for approximately five to ten minutes D'Andrea was alone with N.K. In fact, D'Andrea had a camera viewing his yard and a still-photo was taken of D'Andrea alone with N.K.

{¶41} The next day, on Monday, August 5, 2024, N.K. was taken to "Camp Clay," a YMCA summer day camp she had been attending. As N.K. and the other children at the camp were getting ready for swimming, Brittney B., who was running the day camp, noticed abnormal bruising on N.K.'s inner thighs. Brittney testified that "[t]he bruises were extremely dark, and they were in kind of a questionable area. It seemed like not a normal kind of kid bruise." (Tr. at 291). Brittney testified that she had "personally [] never seen bruising like that on a child of that age before." (*Id*.) Brittney also observed the clothes that N.K. had changed out of to get into her swimming clothes and there were dark spots in N.K.'s

underwear. Brittney testified that she had not seen N.K. fall or hurt herself that day and she did not recall anything unusual regarding N.K. from the prior Friday.

{¶42} Brittney testified that she got a better look at the bruises when she went to apply sunscreen to N.K. Brittney then asked N.K. about the bruises and took photographs of the bruises. She noted there were some scratches on N.K.'s neck and that N.K. had a busted lip.

{¶43} Brittney made an audio recording of her conversation with N.K. Brittney initially asked how N.K. got the bruises on her legs. N.K. responded that she "just gotted [sic] mad at home." Brittney asked if N.K. had hurt herself, and eventually N.K. stated that she was "playing outside then I…then I did these marks." When Brittney asked what N.K. made the marks with, N.K. stated she used "a hard piece at home." Brittney asked what N.K. was doing with the "hard piece" and N.K. indicated she was scraping it against her legs because her leg was "itchy." N.K. stated she got hurt very easily.

{¶44} Another summer camp employee joined the conversation and Brittney continued to ask N.K. questions. Brittney asked if someone was hurting N.K. and N.K. said her "dad" was hurting her. N.K. then told a second story about the bruises, stating that she was outside running the day before and she fell on her side. Brittney responded that she was also clumsy but falling did not usually leave bruises in that area and she asked if someone else did the bruise on N.K.'s thighs. N.K. stated that "Someone else did that bruise." Brittney continued to ask N.K. questions and N.K.

stated that she was hurt by an adult in her home. The recorded conversation was played for the jury.

{¶45} Following the conversation, Brittney called her superior and her superior called the police. A sheriff's deputy came to the camp and spoke with N.K. The deputy was actually the school resource officer at N.K.'s school, so N.K. was happy to see him at first. The deputy testified that when he asked how things were at home, N.K. stated things were bad and she started to shut down.

{¶46} The deputy asked about the injuries and N.K. indicated her dad had done them to her. She stated that she was running laps as a punishment and her dad had kicked her between the legs. N.K. indicated that she had done the scratches to her neck herself and she had busted her own lip when she bit it.

{¶47} That same day N.K. was taken to another foster home. The following morning N.K. was taken to Dayton Children's Hospital for an evaluation. Dr. Jennifer Tendler evaluated N.K. and she testified at trial. Dr. Tendler was qualified, without objection, as an expert in child abuse pediatrics.

{¶48} Dr. Tendler testified that she was made aware of N.K.'s disclosures regarding possible abuse and of N.K.'s history of self-harm. N.K. told Dr. Tendler that N.K. was having pain in her legs, that she had a bruise in her private area, and that she had discomfort when urinating. Dr. Tendler observed "extensive bruising" on N.K.'s thighs. Dr. Tendler could not complete her full evaluation of N.K. initially

because N.K. was in so much pain. N.K. had to be transferred to the emergency department and sedated for the rest of the evaluation.

{¶49} Dr. Tendler took photographs of N.K.'s injuries, which were introduced into evidence. The photographs show extensive bruising on both of N.K.'s inner thighs, and on the back of one of N.K.'s legs. In addition to the extensive bruising on the thighs, Dr. Tendler observed "a number of genital injuries" such as "bruising on the mons pubis" and a small laceration to the inferior part of the mons pubis. N.K. had a hematoma on her mons pubis and bruising to the bilateral labia majora. She also had a bruised clitoris. Dr. Tendler suspected that N.K.'s bleeding in her genital areas was from the laceration on the mons pubis as N.K. had not started menstruating.

{¶50} Dr. Tendler documented N.K.'s injuries and indicated a concern for "suspected child abuse." Her report stated, "These exam findings are extremely concerning for child physical abuse and consistent with a history of blunt trauma and child abuse reportedly disclosed by the patient. The patient would not be expected to be able to cause this constellation of genital and thigh injuries to herself." (State's Ex. 11).

{¶51} Dr. Tendler testified that she had seen the videos of N.K. engaging in self-harm and those displayed behaviors would not explain the injuries to N.K. On cross-examination Dr. Tendler testified that she had made diagnoses in the past that

injuries were consistent with self-harm, but she did not believe the injuries in this instance were a result of self-harm.

{¶52} N.K. testified at trial that D'Andrea kicked her between the legs and that was how she was injured. She testified that D'Andrea told her not to tell anyone about the incident. N.K. acknowledged that she had hurt herself before.

{¶53} During cross-examination, N.K. testified that she actually hurt herself on the date of the incident and that nobody kicked her. But on re-direct examination she testified that D'Andrea had kicked her and she was telling the truth.

{¶54} D'Andrea presented the testimony of two expert witnesses. The first expert witness was a forensic social worker who testified regarding the recorded conversation between Brittney, the YMCA summer camp employee, and N.K. The forensic social worker testified that although Brittney was not conducting a formal "forensic interview," Brittney repeatedly made mistakes in questioning N.K. The forensic social worker testified that Brittney asked compound and leading questions that were very likely to lead to a "false positive" reporting of abuse. Importantly, the forensic social worker did not analyze the interview between the deputy sheriff and N.K.

{¶55} D'Andrea presented the testimony of another consultant/expert witness who was a registered nurse. The nurse testified that the injuries to N.K. could be consistent with self-harm. She also testified that the injuries were not

consistent with five kicks to the groin area[3], but the injuries could be consistent with other forms of blunt-force trauma.

Analysis

{¶56} This case involves competing expert witnesses and a child who had told multiple stories regarding how she had received injuries to her legs and groin area. The State presented the narrative of D'Andrea kicking N.K. in the groin while he was alone with N.K. in the yard. The State's case was based on N.K.'s testimony and it was supported by the testimony of Dr. Tendler.

{¶57} The jury was able to hear and evaluate not only N.K.'s testimony, but her initial disclosure at summer camp, which contained multiple stories of the injuries. Through numerous avenues D'Andrea challenged N.K.'s credibility, noting that N.K. had a history of both lying and self-harm. D'Andrea's attorney thoroughly attacked the State's investigation, indicating that there were significant flaws in Brittney's interview and significant flaws with the procedures at Dayton Children's Hospital. Nevertheless, the jury believed N.K.'s testimony.

{¶58} It is well-settled that a conviction is not against the weight of the evidence because the jury elected to believe the State's version of events over the defendant's version of events. *State v. Green*, 2023-Ohio-4360, ¶ 136 (3d Dist.). The jury in this case was discerning and acquitted D'Andrea of the charge related to

---

[3] N.K. told the deputy sheriff that D'Andrea had kicked her multiple times.

corporal punishment. After reviewing all of the evidence in this case, we do not find it is one of the exceptional cases where the evidence weighs "heavily" against the conviction. We do not find that the jury clearly lost its way in this matter. Therefore, D'Andrea's third assignment of error is overruled.

*Conclusion*

{¶59} Having found no error prejudicial to D'Andrea in the particulars assigned and argued, his assignments of error are overruled and the judgment of the Van Wert County Common Pleas Court is affirmed.

***Judgment Affirmed***

**MIILER, and WILLAMOWSKI, J. J., concur.**

Case No. 15-25-10

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.   The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

 

Juergen A. Waldick, Judge

 

Mark C. Miller, Judge

 

John R. Willamowski, Judge

DATED:
/jlm

-23-